Argued at Pendleton October 29, 1940; affirmed February 18, 1941

IN RE DEMARIS' ESTATE

DEMARIS *v.* FULLER ET AL.

(110 P. (2d) 571)

In Banc.

*Will M. Peterson,* of Pendleton, and *Homer I. Watts,* of Athena (Peterson & Peterson, of Pendleton, on the brief), for appellant.

*J. F. Kilkenny,* of Pendleton (Raley, Kilkenny & Raley, of Pendleton, and W. F. Crowe, of Walla Walla, Washington, on the brief), for respondents.

ROSSMAN, J. This is an appeal from an order of the circuit court which, after dismissing a contest of an instrument testamentary in form which was presented to the county court for probate as the last will and testament of George Demaris, deceased, held that the said instrument was in truth the last will and testament of said deceased and was entitled to probate as such.

George Demaris, a bachelor, 39 years of age, died in Milton, Umatilla county, April 11, 1939, leaving an estate which was appraised as worth $7,347.57. The contested instrument made the deceased's sister, Ida Fuller, sole beneficiary. She is the proponent. The original contestant was Amos Demaris, father of the deceased. He died after the proceeding had begun and was succeeded as contestant by Arch Demaris, his son and executor of his estate. The petition made two charges against the script: (a) improper execution; and (b) undue influence. The latter charge has been

virtually abandoned. The findings of fact of the circuit court state:

"At the time of the execution of said will George Demaris was not acting under duress, fraud or undue influence."

We have carefully read the transcript of evidence and are fully satisfied that there was no room for any other finding. The evidence shows that when he signed this instrument the deceased was free from all improper influences and acted purely upon his own volition. His mind was clear.

The portion of the petition which recites the charge of improper execution says:

"Said instrument of writing was prepared by Harold B. Gillis, in the absence of George Demaris and it was never read by nor read to him and he did not know the contents thereof at the time he subscribed his name thereto; that after the said George Demaris subscribed his name thereto, the said instrument of writing was taken from the room occupied by the said George Demaris into another room more than twenty-five feet from the said George Demaris, entirely out of his sight and wholly out of his presence, where it was then signed by the said Harold B. Gillis and Jean I. Gillis, his wife, as pretended witnesses, and the said George Demaris did not see either of said witnesses subscribe his or her name to the said instrument of writing and he did not know and never did know who were witnesses to the said instrument of writing or whether the same was witnessed by anyone or at all."

It will be observed that the signatures of the testator and of the two attesting witnesses are conceded. The only issues, therefore, are: did the testator know (1) the contents of the instrument, and (2) the identity of the attesters; and did the attesting witnesses sign

"in the presence of the testator" within the contemplation of § 18-201, O. C. L. A., which says:

"Every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will, in the presence of the testator."

George Demaris' mother had predeceased him. His father was still living at the time of George's death, but died shortly thereafter. He left no estate, unless George's descended to him. Since George left no issue, and since his mother had predeceased him, his estate descended to his father, if the will under attack is invalid. The father's will bequeathed the sum of one dollar to Ida Fuller, sole beneficiary of George's will, and of the remainder of the estate left to Ann Kelly and Arch Demaris one-fourth each. All three of those persons were children of Amos Demaris; Ann and Ida were sisters of George, and Arch was his brother. We shall refer to these three frequently hereafter. As has already been said, Ida Fuller is the proponent and Arch Demaris is the contestant. Ann Kelly was one of the latter's principal witnesses. George was the youngest of the nine children of Amos Demaris and his wife. Some time before their deaths the parents had separated. This and other circumstances caused friction to develop, not only between some of the children and the father but also between some of the children themselves. George was one of the children who sympathized with his mother and evidenced displeasure at his father's course. He and Ida were near in age and shared the same views. Ida did not marry until a year or so before George's death.

We shall now give a resume of the evidence which bears upon the above charges. George Demaris lived upon a farm situated near Milton. April 2, 1939, he was taken ill and summoned his sister, Mrs. Ann Kelly, who lived nearby. Shortly she took him to the office of Dr. Harold B. Gillis in Milton. Dr. Gillis is the person named in the contestant's petition. At the time of George's arrival Dr. Gillis was absent, but his wife, a registered nurse, who was in charge of the office, communicated with her husband by telephone. Pursuant to instructions which she received over the telephone, Mrs. Gillis administered to George a quarter grain of morphine, the purpose being to relieve the intense pain from which he was suffering. George weighed 190 pounds. The uncontradicted evidence indicates that a man of that weight, experiencing pain as intense as that which George was suffering, could sustain no lessening of mental powers from the administration of a quarter grain of morphine.

The witnesses referred to Dr. Gillis' office as a clinic. It was a one-story building, 30 by 30 feet in ground dimensions, divided into eight rooms. We are concerned with only the three front rooms. These were a waiting room with a consulation room to its left and a treatment room to its right. The following plat, drawn to scale, will assist in an understanding. The two doors connecting these three rooms were 29 inches wide. The plat shows a cot and a bed in the treatment room and a desk in the consultation room.

When George entered the clinic he was taken at once into the treatment room and was placed upon the cot. In order to make him more comfortable a bed was then brought into the room and he was placed upon it with his head toward the west. The cot was

22 inches wide and the bed 36 inches wide. The two were placed within a few inches of each other. When the door was open it touched the foot of the cot. Next to the north wall of the treatment room was some electrical equipment. Between the equipment and the bed there remained a space about a foot and a half wide. It was in this space, or narrow corridor, that Mrs. Kelly and Dr. Gillis stood when the incidents which we shall shortly describe took place. After the bed had been moved into the room George was placed upon it. We have marked on our plat indications of the cot, bed and desk in substantially the same places where Mrs. Gillis sketched off-hand similar representations. No one questioned the substantial accuracy of her markings, nor of the plat from which we reproduced ours.

George arrived at Dr. Gillis' clinic about 7:30 or 8:00 p. m. Thirty to forty minutes later Dr. Gillis returned from Pendleton and at once examined George whom he found to be suffering from a complete obstruction of the small intestine. His condition caused George to experience intense pain over the entire abdomen and at intervals of about five minutes to retch and vomit. By this time there had arrived at the clinic, besides Mrs. Ann Kelly, Harold Biggs, who was in her employ as a farm laborer, Ida Fuller and her husband, Arch Demaris and his wife, and Goldie Shelton, another sister of George.

We shall now describe the preparation and execution of the will by employing Dr. Gillis' narrative of it. An understanding of the issues will be facilitated, we believe, by stating at this point that Dr. Gillis' narration of the facts is challenged by the contestant

in only three details. He does not contend—at least not expressly—that Dr. Gillis sought to do other than tell the truth. The three details are: (1) Dr. Gillis swore that his wife was present when George signed the will; the contestant claims that she was not present, but that Mrs. Kelly was in the room; (2) Dr. Gillis said that while preparing the will he asked Mrs. Fuller for the spelling of the name Demaris; the contestant claims that it was Mrs. Arch Demaris, and not Mrs. Fuller, to whom this inquiry was directed; (3) the contestant claims that Dr. Gillis held the will in his hand, visible to all, when he entered George's room for the purpose of having him sign it, and that the physician swore that the will reposed in his pocket. Our examination of the record discloses that Dr. Gillis was silent upon the subject. Hence, Dr. Gillis' version of the facts differs in only two details from that given by the contestant's witnesses. Our purpose in having stated these circumstances before beginning the narrative is to indicate that we are relating testimony which is free from dispute except in two particulars.

After Dr. Gillis had made his examination he arrived at the conclusion that an operation was necessary and so told the members of the family that had gathered. He suggested that it might be advisable to secure a consultant. It was agreed that Dr. J. W. Ingram of Walla Walla should be called. He did not arrive, however, until after the incidents with which we are concerned had taken place, and hence we shall have no occasion to mention him again. Before Dr. Ingram arrived, which was about 10:00 p. m., Dr. Gillis was told that George wanted to speak to him. Dr. Gillis had been in Milton for only two years and had not known George prior to this evening. Likewise,

Mrs. Fuller was a stranger to him, but he had attended other members of the Demaris family. After George had made known his wish to speak to Dr. Gillis alone, the physician asked those in the room to leave. Apparently those who were in the room were Mrs. Fuller and Mrs. Kelly. After they had stepped into the waiting room Dr. Gillis closed the door. We now quote from his testimony: "After everybody had left there he said, 'Doc, I am in an awful serious condition and I don't know whether I will live. If I don't live, I want my sister Ide to have everything I have got.'" "Ide" was George's nickname for his sister Ida Fuller. Continuing, the physician said, "I believe the first thing that I did, I asked if he had a previous will and he said 'No.' Then, I asked if he wanted to leave all of his money and real estate and personal properties, and he said 'Yes.' And so, I said, 'I will draw it up as to that effect.' And I went into my office and got out my stationery and started to typewrite that down but I didn't know the complete name of the beneficiary or her address. (Q.) That was Mrs. Fuller? (A.) Mrs. Fuller. And so I called her into my private office to ask her name and address and I don't believe at that time I told her it was for a will, and I merely asked her her name and address in Walla Walla." When he said that he repaired to his private office for the purpose of typewriting the will he meant the room indicated upon our plat as the consultation room. Our plat shows a desk in that room. Upon the desk stood a typewriter and it was upon that instrument that he wrote the will. Before Dr. Gillis left the room George had asked him not to mention to those in the waiting room the request which he had just made for the

preparation of the will. A copy of the script which the witness prepared follows:

"Milton, Oregon
April 2, 1939

Being sound of mind I, George Demaris, do will and bequeath all real and personal properties as well as monies to my sister, Ida Fuller, 846 N. 9th St., Walla Walla, Washington.

Signed

Witnessed by                    ''

Dr. Gillis said that this was the first will he had ever prepared, and added, "the last."

Only two or three minutes were consumed in typing the will and thereupon Dr. Gillis reentered George's room, bringing with him not only the writing but also a pen and a magazine. He swore that when he reentered the room Mrs. Gillis was there attending to George and that they were the only two persons in the room. He could not recall whether he closed the door after reentering. We now quote from his testimony: "I took a pen with me and a magazine for him to write on and propped him up in bed. He was lying on his left side. I put him up so he could write and I said, 'George, here's the will,' and it 'bequeathed all your monies and real and personal properties to your sister Ida Fuller' and to sign here." He said that George, who was in severe pain, did not read the will before signing and that he (Dr. Gillis) did not read it to him. Further testifying, he swore that while George was signing his name to the instrument he had another attack of cystic vomiting and thereupon Mrs. Gillis departed for the purpose of obtaining some towels. He explained that George refused to use an emises basin, hence, the need for the towels. As Mrs. Gillis hurried out of the room "someone came into the room," so

the physician swore. After George had completed his signature Dr. Gillis left the room and took the script with him. Twenty to thirty minutes later he and his wife entered the consultation room and there, as attesting witnesses, signed the will. The witness said that George had not expressly asked him to sign. He could not recall whether the doors of the waiting room were closed at that time. When he signed he was seated in a chair on the north side of the desk, and when his wife signed she was standing on the south side of the desk. The desk was 34 by 60 inches in size. The witness swore that it was impossible for George to have seen him (the witness) when he signed the will, but that it was physically possible for George to have seen Mrs. Gillis sign. After the two had signed as attesting witnesses, Dr. Gillis placed the will in a compartment of his desk. Before doing so he did not show it to George; in fact, after George had signed the will he never saw it again.

Dr. Gillis testified that following the operation George's condition showed marked improvement until 3:30 in the morning of the day of his death, which was nine days after the operation. The cause of the death, according to the physician, was cerebral embolism. In the period in which George seemed on the way to recovery, "I kidded him," so Dr. Gillis testified, "about not needing his will." George's only response, according to the witness, was "he smiled and felt pretty good." Upon cross-examination the witness slightly elaborated upon the above narrative. Among other matters, he said, "I remember I told him that here was his will, and that he had bequeathed—willed all of his monies and properties to his sister Ida." Some time after George had signed the operation was performed.

Mrs: Gillis testified that she knew nothing about the preparation of the will. Her first information about the writing came when her husband entered the room where she was attending George and "said, 'Here, George this is what I have written' or something to that effect, and read—he didn't read it, he just told him the contents of what he had written * * * I believe it was something like this, 'I bequeath all of my real and personal property to Ida Fuller.' Something like that. That was the contents anyway." Upon cross-examination, her words were: "He came in and shut the door and said, 'Here it is, George.' And he told him the contents—I don't remember the words. He told him the contents and he held it in his hand and he picked up the magazine and put the will on the magazine and put the will so he could see it." She testified that she remained in the room until George had written "George D" whereupon George began to vomit and she rushed out of the room for a supply of towels. About twenty to thirty minutes later she met her husband in the consulation room and was then asked by him to sign as an attesting witness. George had not asked her to do so. She said that when her husband made this request she at first demurred, explaining that she did not care to have anything to do with wills, but yielded and signed when he said, "You are the only one here that is not a relative." She too swore that her husband was seated in his office chair and that she signed while standing on the south side of the desk. Both doors of the waiting room stood open. She said that George, while lying in the bed, could have seen her in the act of signing the will had he looked, and added that while she was signing she could plainly see George. She too said that it was impossible for George to have seen Dr. Gillis sign. The will was not

signed sooner, she explained, because in the interval she was engaged in performing various duties for other persons in the clinic. At the time of the signing there were in the reception room, according to her testimony, Mr. and Mrs. Arch Demaris and Mr. and Mrs. Fuller. Mrs. Kelly at that moment was attending George. Upon cross-examination, she was asked to estimate how far George was from her when she signed. She answered that the distance was 15 or 16 feet. She was unable to say whether George saw her sign.

Like her husband, Mrs. Gillis testified that a day or two after the operation George showed great improvement. In fact, he shortly talked about returning home and made arrangement for Ida Fuller to stay with him then. In his conversations with Mrs. Gillis he said, so she swore, "If anything does happen to me, I want Mrs. Fuller to have everything." She was then asked, "Did he mention the will itself?" Her reply follows: "Yes. Yes, he asked me if the doctor had the will, but he never at any time asked to see it. He asked me if it was in safekeeping. * * * He asked me if I had witnessed the will and I said 'Yes.' And he said, 'I thought so.' and that was about all of the conversation there was about witnessing." She thought that conversation occurred the third day after the execution of the will. Upon further questioning, she added, "He asked me if I didn't sign it, and I said, 'Yes.' And he said, 'Yes, I thought you did.' And he said, 'I know Doc did.'" Mrs. Gillis swore that she had never seen either George or Ida Fuller prior to the evening when the two entered on account of George's illness.

The bed upon which George lay was more than six feet long and was higher than an ordinary bed. Since

the treatment room was only nine feet long, the foot of the bed was less than three feet from the door opening.

We shall now review briefly Mrs. Kelly's testimony. She said that Dr. Gillis was her family physician and that she still called him when necessary. She admitted that Mrs. Gillis was her friend. It will be recalled that Mrs. Kelly brought George to the hospital. She helped place him in the bed and then left temporarily to summon Mrs. Fuller. After this errand had been completed she returned to the hospital and stayed with George until he was taken into the operating room, about two and a half hours after his arrival. She testified that she and Mrs. Fuller were in the room when Dr. Gillis asked those in it to step outside. After they had gone out, she said, the door was closed and "in a short time" the doctor came out and went to the consultation room. At that moment Mrs. Kelly returned to George's room, taking a place at the head of the bed. It will be recalled that the only space available was about a foot and a half wide, being the space between the bed and the electrical equipment on the north wall. In three or four minutes, so she said, the doctor returned, leaving the door open after entering. We now quote from her testimony: "I think he had a magazine because he didn't lay it down on the bed. He had a book or magazine for him to write on and he just held it out and George raised up his arm and I am positive that he didn't put up his head because if you will look at that you will see that it is wrote a little crooked, and that it isn't just exactly straight that you could look and see it wrote.

"The Court: And you were right there by his head?
"The witness: Yes."

Her statement, "It is wrote a little crooked" had reference to George's signature to the will. The signature, more especially the surname, appears to be poorly written. Mrs. Kelly, when further questioned, testified that when the doctor returned to the room he "had a paper and he came up and he said, 'Sign this George.' That is all the doctor said." She was then asked, and answered, as follows:

"Q. Did he say, 'This was a will, willing your property to your sister Ida'?

"A. No, sir."

She said that George next "lifted his arm up and wrote something" whereupon "the doctor went out; that is all I know." According to her, Mrs. Gillis was not present at that time. Shortly, as disclosed by the transcript of testimony, the following took place:

"Q. And you were in there all the time?

"A. Yes.

"The Court: When George signed this will, was there anything which made him stop from the start to the finish—

"The witness: No, I should say not.

"The Court: —when he signed this document, or not?

"The witness: No, there was not. He raised his hand up and wrote something.

"The Court: He started coughing at that time?

"The witness: No, he did not. I was standing right there beside him. * * * I was there by the side of his head."

When Mrs. Kelly was shown the will now under consideration and was asked whether or not she could say that it was the instrument which she saw George sign, she replied, "No, I couldn't because I didn't look at it. I seen it was a paper he was signing but I didn't

read it because I was not close enough to read it."
It will be recalled that she more than once said that
she was standing immediately adjacent to George's
head. Shortly she added, "He was just about that
close to me (indicating) and I didn't have my glasses
on and I couln't see to read." She was then asked,
"That would be two and one-half or three feet from
you?" and replied, "As near as I can remember, that
was the way it was." The witness declared that when
Dr. Gillis presented the paper to George for his signa-
ture he placed it flat on the bed in front of George.

Harold Biggs, the previously-mentioned farm
laborer in the employ of Mrs. Kelly, was called as a
witness for the contestant. He swore that he came to
the clinic and took a seat upon a davenport which stood
against the south wall of the waiting room. While
seated there he saw Dr. Gillis enter George's room and
heard him say, "Clear the room." Thereupon Mrs.
Kelly and Mrs. Fuller left the room and entered the
waiting room. "A minute or two" later, according to
Biggs, Dr. Gillis left George's room and returned to
the consulation room. While seated at his typewriter,
Dr. Gillis motioned to Mrs. Arch Demaris, so Biggs
testified, and asked her how the name Demaris was
spelled. At the same time when Dr. Gillis left George's
room he (Biggs) saw Mrs. Kelly return to that room.
Continuing, he said that "in a little while" Dr. Gillis
returned to George's room. Mrs. Kelly was in the room
at that time, according to Biggs, and Mrs. Gillis was
not. What next took place he described as follows: "All
I heard the doctor say was 'Sign this George.' " He
swore that from his place on the davenport he could
see the doctor in the room facing George, and Mrs.
Kelly at the head of the bed. In a moment Dr. Gillis

left the room and returned to the consultation room. Upon cross-examination, this witness was asked, and answered, as follows:

"Q. Did you see the doctor hand him this paper?
"A. No I couldn't say that I did.
"Q. Did you see the doctor hand him a pen or pencil?
"A. Yes.
"Q. Did you see him sign it?
"A. Yes.
"Q. You could see Mr. Demaris on the bed?
"A. Yes.
"Q. Did he raise up on the bed?
"A. Yes.
"Q. Could you see his face and hands?
"A. Yes.
"Q. You are positive of that?
"A. Yes."

Arch Demaris, the contestant, who helped to place George in the bed, remained near at hand until George was taken to the operating room. We shall now review his testimony. He saw Dr. Gillis in the course of the evening enter George's room and heard him say, "Clear the room." Following this direction, Ida Fuller and Ann Kelly stepped into the waiting room where Arch was seated. In a few minutes he saw Dr. Gillis return to the consultation room and at that moment, since "George started to throw up, she (Mrs. Kelly) run in the room." After Dr. Gillis had seated himself at his desk he asked Arch's wife whether a capital or a small M was used in the name Demaris. In three or four minutes the doctor "went into George's room and he said 'Here, George, sign this.' * * * Well, the doctor—my sister Ann Kelly was standing right at the head of the bed and the doctor walked in, and there was a passage probably a foot wide, as near as

I can remember. He was kind of stooped over and he kind of reached that book or whatever he had with him out there and said, 'George, sign this.'" According to Arch, Ann Kelly, and not Mrs. Gillis, was with George at that time. Arch at that time was seated upon the aforementioned davenport and, according to his testimony, "I seen George lift his hand up like he was going to sign it." He was then asked whether he could see any movement of George's hand, and replied, "I seen him raise his hand but I never paid any more attention about him signing." At that point, according to Arch, "the doctor came back out," and went to the consultation room. Upon cross-examination, Arch testified that after Dr. Gillis had typed the instrument he carried it into George's room, not in his pocket, but openly, where it was visible to those who cared to look. He also swore that from his position on the davenport "I couldn't say that I could see all of the bed; * * * I could see, oh, I would say half of the bed anyway." He was positive he could see George's hands, face and head.

Bessie Demaris, wife of Arch, was another of his witnesses. She had known Dr. Gillis about a year and said that she and the physician's wife were good friends. She was seated upon the davenport when the incidents which she described occurred. She saw Dr. Gillis enter George's room where Ida Fuller and Ann Kelly were endeavoring to comfort George. According to her testimony, she then heard Dr. Gillis say, "Clear the room, all of you, clear the room." The two women then left and the door was closed. In a few minutes Dr. Gillis left George's room, went into the consultation room, seated himself by his typewriter and began to type. Next, "he motioned for me to come like that (indicat-

ing) and I went and stood at the end of the desk and he said, 'How do you spell Demaris, with a capital M or a small M?' " After the typing had been concluded she saw Dr. Gillis reenter George's room and heard him say "Sign this George." At that moment, according to this witness, Mrs. Ann Kelly was at the head of George's bed. We now quote further from her testimony: "And George raised up but I couldn't see him sign his name on that, but I could see his arm move. * * * He said 'Sign this George' and George raised up and signed." She swore that she did not know the nature of the paper that George signed and said that its contents had not been read to George.

The only other witness whose testimony we shall mention is that of Ida Fuller. We shall mention only a minor part of hers. She testified that Dr. Gillis inquired of her, and not of Mrs. Kelly or of Mrs. Bessie Demaris, for the manner of spelling the name Demaris. She further testified that besides asking for that information, the doctor also asked for her (Mrs. Fuller's) address. By reverting to the copy of the will, set forth in a preceding paragraph, it will be observed that Mrs. Fuller's name, street and post office addresses all appear in the will. Since that is true, and since none of the other witnesses who contradicted Mrs. Fuller claim that they gave that information, this circumstance speaks strongly in favor of Mrs. Fuller as a truthful witness. However, we are free to confess that this issue is minor.

A high degree of affection was manifested between George and his sister Ida Fuller, sole beneficiary of the challenged document. The last fact that we shall mention will be stated in the words of the memorandum decision of the circuit judge who tried this case. His

description is apt and well sustained by the record. It follows:

"*  *  * the beneficiary of the will, Ida Fuller, throughout her entire life, has displayed a tireless devotion to the testator. It is true that her brothers and sisters are honest, industrious and splendid law-abiding citizens; but in sickness and distress, in good times and bad, she was the one who was always ready to sacrifice her own time and energy, whenever the testator, her brother, needed help. When he was sick, no matter where she might be, she was the one who was called upon to return, and care for him. Freely and gladly she answered the call and nursed him back to health. If he had not remembered her in his will, it would have appeared strange. While she is not old, she is no longer young, and is poor financially. He chose the honorable course, and it was only to be expected, that when he was stricken, and on his death-bed, and no doubt with a foreboding that he was approaching the end, his thoughts should turn towards this sister, who had been so unselfish and devoted to him.  *  *  *"

None of the contestant's witnesses were questioned about the attestation of the will, nor were they asked whether Dr. and Mrs. Gillis met in the consultation room after George had signed the script. Since there is no testimony at variance with what the attesters said upon the subject of attestation, their testimony stands unchallenged.

The above will have to suffice as a narrative of the evidence. The findings of fact of the circuit court state:

"*  *  * Dr. Gillis, after receiving the instructions to prepare the will from the testator, went to his own office and there prepared the last will and testament which is in controversy. That the doors were not again closed during the time while the document was being prepared and signed. That after completing the Will, Dr. Gillis and his wife took the Will to the testa-

tor on the cot; that at said time the contents of the Will were explained to the testator; that the testator thereupon started to subscribe his name to the will in the presence of Dr. Gillis and Mrs. Gillis; that Dr. Gillis was there all the time while the testator signed the will; that Mrs. Gillis saw the testator sign the name 'George' and saw him start to sign his surname 'Demaris'; that thereupon Mrs. Gillis left the receiving room to go to the rear of the hospital for some towels; that shortly thereafter Dr. Gillis and his wife went to the doctor's office and the doctor signed his name as a witness and requested Mrs. Gillis to sign her name as a witness, which she did; that from the point where Mrs. Gillis stood in front of the desk Mrs. Gillis was able to look through the door and see the patient, and that she was watching him because of his condition; that Dr. Gillis subscribed his name as a witness while sitting in a chair on the left side of the desk and could not see or be seen by the testator while actually witnessing the document; that while witnessing the document Dr. Gillis was directly in front of his wife across the table who could see the testator as well as the doctor; that George Demaris could have seen the witness Mrs Gillis sign when she signed if he had looked; that he could not have seen Dr. Gillis sign; that the testator knew that Dr. Gillis had signed the Will as a witness, and some days later determined that Mrs. Gillis had signed the Will as a witness; * * *''

Evidently the word ''cot'' is used in the seventh sentence of the above finding as a synonym for ''bed''. We believe that the above finding is warranted by the evidence, and adopt it as our own. We are convinced that Dr. Gillis and his wife told the truth. Notwithstanding that conviction and the above finding, we believe that it is altogether possible that Mrs. Kelly saw George sign the will. The door to George's room was open except for the brief interval while Dr. Gillis took the directions for the will. At all other times

those in the waiting room heard what was going on in George's room; in fact, he lay before the open door in view of all. It is possible that Mrs. Kelly stood where she could see George sign; or it may be that she entered just after Dr. Gillis. Undoubtedly if George's brothers and sisters were distressed by the sight of him lying ill in a hospital awaiting a serious operation, and surely they were, they were in no mood for taking careful note of the details attendant upon the preparation of the instrument. Accordingly, we dismiss as unimportant the slight conflicts in the testimony. The will was prepared by an individual who had no personal interest to serve. He was unfriendly to none of those who now contest it; to the contrary, he was their physician and friend.

We now return to the statute which the contestant says was disregarded when George and the Gillises subscribed their signatures to the questioned instrument. The part which is applicable says that the witnesses must sign the will "in the presence of the testator." By reverting to the language of the contestant's petition, it will be seen that the contestant admits that the document under consideration actually bears the testator's and attesters' signatures. The contestant, therefore, does not challenge the genuineness of any of the three signatures, nor does he claim that the instrument under review is a document which George did not intend to sign. Nevertheless, since the requirements of the statute are mandatory, it is necessary that the evidence should show that the attesters signed "in the presence of the testator." In other words, it is essential, not only that the signatures be genuine and that they be found upon an instrument which all three persons intended to sign, but also that

the attesters signed in the testator's presence. We shall shortly take note of the reason for the requirement.

The admissions made by the contestant are well justified by the facts. It will be recalled that Mrs. Kelly said that she was alongside the bed within arm's reach of her brother's hand when he signed the will. Harold Biggs, Arch Demaris and the latter's wife described the execution of a paper by George which, it develops, was his will. This is, therefore, a case in which the signatures of all three people are not only admitted, but were made under the very noses of the contestant, his wife, his sister and the latter's employee. Since the will was written upon a single sheet of paper, and since Mrs. Kelly took such careful note of her brother's act in signing the will that she was in a position to comment upon the peculiar slant of the letters, the circumstances afforded no opportunity for the substitution of a spurious copy. Indeed, no one even intimates that a substitution took place. This is a case in which (1) the will was typed in the presence of the contestant and of his witnesses, one of whom says she helped the draftsman by spelling for him the name of the testator; and (2) the will after being typed was carried by the draftsman openly into the room of the testator where, in a voice loud enough to be heard not only by the testator but also by those in the waiting room, he presented it to the testator for his approval and signature.

The meaning of the phrase "in the presence of the testator" has been the subject of much controversy and of diversity of opinion. Decisions directly opposite to one another can be readily found. Some of the decisions restrict a testator to his sense of sight in ascertaining whether his attesting witnesses are in his

presence when they sign. They hold that if he and the attesters are in the same room all are prima facie in each other's presence, but if the attesting signatures are written in another room, then, prima facie, the statutory requirement was violated. If a counterpane stretched between the bedposts, to shield the testator from drafts, is between him and the attesters, the attestation is invalid: *Reed v. Roberts*, 26 Ga. 294, 71 Am. Dec. 210. These strict interpretation courts go further. For instance in *In re Beggan's Will*, 68 N. J. Eq. 572, 59 Atl. 874, and *Graham v. Graham*, 32 N. C. 219, the courts held that before a finding could be authorized that the attesting witnesses signed in the testator's presence it must appear, not only that the testator could have seen them sign had he chosen to look, but that he did actually see the will and the writing of the signatures as the attestation took place. *Burney v. Allen*, 125 N. C. 314, 34 S. E. 500, 74 Am. St. Rep. 637, represents a slight restriction upon the interpretation just noticed. The court there merely demanded proof that the testator could have seen had he cared to look: It said: "He must have the opportunity, through the evidence of ocular observation, to see the attestation." It took pains to point out, however, that if illness rendered it impossible or dangerous for the testator to move his head in order to watch the attesting witnesses, the attestation would be deemed invalid. It will be observed that those courts insist upon the sight test as the medium to be employed in determining the validity of the attestation. Many other decisions to like effect appear in the reports. The courts which insist upon the sight test disregard all others. For instance, in *Calkins v. Calkins*, 216 Ill. 458, 75 N. E. 182, 1 L. R. A. (N. S.) 393, 108 Am. St. Rep. 233, the facts were that after the testator had signed

his will in the presence of the attesters, they withdrew to a table in an adjacent room outside the range of his vision and there signed. Then the witnesses returned to the testator, read the will to him, including their signatures, and showed him the latter. He expressed his approval. The court, after reiterating that "the test of presence of the testator is contiguity, with an uninterrupted view between the testator and the subscribing witnesses," held that the execution was invalid. It repudiated all substitutes for the statutory requirement, and declared that the above was not a compliance with the statute, but an attempted substitute for it. Even where an attester, who had previously signed the will, retraced his old signature with a dry pen in the presence of the testator, the attestation was held invalid: *Playne v. Scriven*, 1 Rob. Eccl. 772, 163 Reprint 1209.

The strict interpretation states, confining as they do the test of presence to the element of vision, experience difficulty in determining what the testator must see when he looks. One of the decisions, *Graham v. Graham*, 32 N. C. 219, which is typical of many others, holds that a view of the attesters' backs is not sufficient; the testator must be able to see the hands and forearms and the paper itself.

For a further interpretation of the word "presence" as employed in the strict interpretation jurisdictions, see *Witt v. Gardiner*, 158 Ill. 176, 41 N. E. 781, 49 Am. St. Rep. 150.

The same courts which insist upon the sight test employ a different one—mental apprehension—when they deal with a blind man's will. They hold that if the blind person's intellect and hearing are good and if he is conscious of what is going on around him,

attestation made within the range of his senses of touch and hearing is valid. See, for instance, *In re Allred's Will*, 170 N. C. 153, 86 S. E. 1047, L. R. A. 1916C, 946, Ann. Cas. 1916D, 788.

Other courts adopt a liberal point of view. They speak of the circumstances of the individual case and of the purpose of the statute. One decision says:

"This requisite of the statute is designed to prevent substitution and fraud upon an intending testator."

*In re Beggan's Will*, supra. Our court has spoken to like effect in *In re Estate of Shaff*, 125 Or. 288, 266 P. 630:

"The reason for the rule, as before remarked, is to obviate any opportunity of the witnesses committing a fraud upon the testator by changing or altering the document."

In fact, in *Shires v. Glascock*, 2 Salk. 688, decided in 1687, ten years after the enactment of the original act (29 Car. II C. B.), and when its purpose was fresh in the mind, the court said that the statute is intended "to prevent obtruding another will in place of the true one." In the much-cited decision entitled *Sturdivant v. Birchett*, 10 Gratt. (51 Va.) 67, the court indicated that

"The object and policy of the law is to protect the testator against the substitution of other persons as witnesses to the solemn act of the testamentary disposition of his property, in place of those in whom he confides and whom he has selected."

The liberal interpretation courts apply to all attestations the test which is employed in strict interpretation jurisdictions to the wills of the blind only: the mental apprehension or conscious presence test. They seem to believe that if the lawmaker meant "within

the sight of" or "in the same room with" he would have said so, and would not have employed the phrase "in the presence of." Immediately after the enactment of the original statute in 1677 the courts took a liberal view of its requirements. For instance, in *Shires v. Glascock,* supra, the court said:

"It is enough if the testator might see, it is not necessary that he should actually see them signing; for at that rate if a man should turn his back, or look off, it would vitiate the will. Here the signing was in the view of the testator: he might have seen it, and that is enough. So if the testator being sick should be in bed and the curtain drawn."

In that case the attesters, at the request of the testator, had withdrawn to another room seven yards distant from him and there signed. The essence of the next two English decisions is thus stated in 2 Va. Law Rev. 403, Attestation in the Presence of the Testator:

"Six years later in Davy v. Smith we have the same dictum only this time it is assumed that the curtains of the bed are drawn 'close.' In this case the testator might have seen the witnesses subscribe their names if he would. Therefore the court's decision in favor of the validity of the will required no extension of the rule heretofore considered.

"The same is true of Casson v. Dade, although it happened accidentally. Being asthmatical, and the attorney's office where the will was drawn up very hot, the testatrix retired to her carriage to execute the will. The carriage happened to get in such a position of proximity to the window that she could see what was going on in the office. This was sufficient."

Illinois, a strict interpretation state, held invalid an attestation made under circumstances exactly like those in the Casson case, with the exception that the vehicle

was an automobile and not a carriage. See *Walker v. Walker*, 342 Ill. 376, 174 N. E. 541.

As we said, the liberal rule states apply what might be termed the mental apprehension test. Its essence is thus stated in *Healey v. Bartlett*, 73 N. H. 110, 59 Atl. 617, 6 Ann. Cas. 413.

"When a testator is not prevented by physical infirmities from seeing and hearing what goes on around him, it is the general, if not the universal, rule that his will is attested in his presence if he understands and is conscious of what the witnesses are doing when they write their names, and can, if he is so disposed, readily change his position so that he can see and hear what they do and say. * * * In other words, if he has knowledge of their presence, and can, if he is so disposed, readily see them write their names, the will is attested in his presence, even if he does not see them do it, and could not without some slight physical exertion. It is not necessary that he should actually see the witnesses, for them to be in his presence. They are in his presence whenever they are so near him that he is conscious of where they are and of what they are doing, through any of his senses, and are where he can readily see them if he is so disposed. The test, therefore, to determine whether the will of a person who has the use of all his faculties is attested in his presence, is to inquire whether he understood what the witnesses were doing when they affixed their names to his will, and could, if he had been so disposed, readily have seen them do it."

This court is committed to the liberal interpretation rule: *In re Estate of Shaff*, supra. In that case the attesters were three in number. The will, which was in the handwriting of the testator, was signed by him and the witnesses in a pool room. One of the attesters, whose name was Smith, after being requested to sign the script, carried it to a desk 32 feet away from the

testator. A partition 12 feet long stood between the desk and the place where the testator was seated, but a small window was in the partition. The decision states:

· "There were some partial obstructions to a view through the window. If unobstructed, the line of vision through the window, from where he claims the testator sat, would have enabled the testator to have seen Smith in the act of signing, \* \* \* we are satisfied that the testator could have seen Smith in the act of signing, if he had chosen to look, and taking into consideration the meticulous pains he had taken in preparing the attestation, we are inclined to the belief that he did look, although, as we shall presently show, actual visible eyesight of the attesting witness is not always necessary to constitute being in the 'presence' of the testator."

The other two witnesses, according to the decision, were

"a little farther away and sitting in a position where he probably could not see them in the act of signing without moving at least his head and shoulders a foot or two to the left."

After the witnesses had signed they returned the document to the testator. In holding that the execution was valid, the decision relied largely upon *Sturdivant v. Birchett*, 10 Gratt. (51 Va.) 67, and *Nock v. Nock's Exrs.*, 10 Gratt. (51 Va.) 106. We quote from it further:

"While it is the duty of the court to observe carefully the spirit and intent of the statute, they will not adopt a strained and technical construction to defeat a will where the capacity and intention is plain and where by fair and reasonable intendment the statute may be held to have been complied with, and such is the case here."

In the Sturdivant case the attesters signed in a different room from that in which the testator was

lying. The latter was 70 years old and used spectacles. He could not see the attesters either from the bed on which he lay nor from any other place in the room. After the attesters had been out of his room for about two minutes they returned and one of them, pointing to their signatures upon the will, said: "Mr. Sturdivant, here is your will witnessed." The testator then took possession of the instrument, and said, "It is my will * * *."

The court, in sustaining the attestation, besides indulging in the observations quoted from its opinion in the Shaff decision, said: "I agree that it is not competent for the court to adopt another and different mode of attestation than that directed by the statute" but pointed out that literal compliance with the statute was not necessary. Substantial compliance, so it said, sufficed. It believed that recognition and acknowledgment of their signatures by the attesters constituted a part of the res gestae of the will's execution. It declared that all that was done constituted one transaction. The decision further said:

"Upon the whole, I think there has been a reasonable and substantial, if not a literal, compliance with the requisites of the statute shown in this case, sufficient for all practical purposes. * * * To reject the will in such a case would be, as I think, to sacrifice substance for form, and the ends of justice to the means by which they are to be accomplished."

Two members of the court concurred in that decision, which was written by Mr. Justice Lee, and two dissented.

In the Nock case the testator's home consisted of two rooms. In one of these he lay in a bed at the time of the attestation suffering from an illness which caused his death the next day. Immediately before the

attestation Nock acknowledged his signature to the attesters who then carried the will to a bureau in another room seventeen feet away, where, with their backs toward Nock, they subscribed their signatures. The door between the two rooms was open and they stood within his range of vision. It was possible for one lying in the bed to see the entire person of anyone standing at the bureau, with the exception of that person's forearms. After the will had been attested one of the attesters claimed that he returned it to the testator and that the latter asked him to keep it. The court, in sustaining the execution of the will, besides indulging in the observation quoted in the Shaff decision, remarked: ''Why is it not at least as good when it occurs in an adjoining room of the same house? Has not the testator the same safeguards against fraud and imposition as if it had occurred in the same room? Has he not the same supervising control over the attestation in the one case as the other?''

In *In re Lane's Estate*, 265 Mich. 539, 251 N. W. 590, an attestation was sustained which, apart from the fact that the will was returned to the testator after attestation, was made under circumstances similar to those before us. The testator was lying in a bed in a hospital and requested his attending physician and one of the hospital nurses to attest his signature. There being no table in the room, the two attesters went to a table in the corridor, about thirty feet from the bed where the testator was lying, and there signed their names. They then showed the will to him and after examining it he expressed his satisfaction. In defining the purpose of the statute, the court said:

''The purpose may also be said to be to require execution under circumstances which satisfy the court

in which it is offered for probate, that it is in fact the last will and testament of the deceased. In placing a construction upon the language of this statute, we must not lose sight of the fact that wills are frequently prepared by persons unfamiliar with its provisions and executed at times and under circumstances where the necessity of strict conformity is not apparent to the testator or the witnesses thereto. * * * The Michigan court was among the first to adopt the more liberal rule of construction."

Shortly it quoted from *Maynard v. Vinton*, 59 Mich. 139, 26, N. W. 401, 60 Am. Rep. 276, as follows:

"I confess I do not see why the word 'presence' should not be held to convey the idea attached to its ordinary signification in the common use of language. It is not a technical term or scientific word. Why should such a meaning be put upon this word 'presence' that implies that every person who is called upon to witness the execution of a will is presumed to be willing and anxious to foist upon the testator a spurious document, and hence required to write his name under the eye (if he has one) of the testator. Such a construction must have been born of suspicion and reared and maintained in distrust, of the morality and honesty of our fellow beings."

Continuing, the decision, after again referring to the facts, said:

"It may fairly be inferred that he was conscious of and understood the reason why they left the bedroom and what they were doing when absent therefrom. They were within his 'call' and within his 'immediate nearness or vicinity.' There is no claim or even intimation, that the instrument signed by them was not in fact that executed by the testator."

For a brief discussion of that decision and a citation to many authorities, see 33 Mich. Law Rev. 465.

*Cook v. Winchester*, 81 Mich. 581, 46 N. W. 106, 8 L. R. A. 822, is frequently cited. The facts in that case were very similar to those in the Lane case. In it, as in the Lane case, the attesters, after returning to the room of the testator, returned the will to him and called attention to their signatures.

In *Cunningham v. Cunningham*, 80 Minn. 180, 83 N. W. 58, 51 L. R. A. 642, 81 Am. St. Rep. 256, the facts were very similar to those in the two Michigan cases. In support of its holding that the execution was valid, the decision cited the second of the two Michigan decisions. The Lane decision at that time had not been announced.

Although in each of those three cases the attesters called attention to their signatures after returning to the testator's bedside, we are satisfied that a mere showing of signatures can not suffice and as such take the place of the statutory requirement. We believe that when the court mentioned the fact that the attesters showed their signatures the court treated that as a circumstance indicating that the attestation took place in the testator's presence; in other words, the signing and the showing were parts of the one transaction.

In *Kitchell v. Bridgeman*, 126 Kan. 145, 267 P. 26, the facts were substantially similar to those in the three cases just reviewed, with the exception that the attesters, upon their return to the sick chamber, neither read the will to the testator nor exhibited their signatures to him; to the contrary, one of the attesters immediately took the will to a distant city. In sustaining the attestation, the court said:

"While the witnesses affixed their names outside of the room and out of the line of his vision, it was done within a few feet of where he was lying. * * *

The testator understood the purpose of the meeting, and participated in the operation. His mind was sound, he was conscious of what was going on, and knew that the witnesses had moved three or four feet over to a table to attest the will, which he had just signed while they stood by his bedside. The execution and attestation may well be considered as a single transaction, and can be said to have been done within his hearing, knowledge and understanding."

Massachusetts employs the liberal interpretation rule in a slightly restricted form: *Raymond v. Wagner,* 178 Mass. 315, 59 N. E. 811, and *Riggs v. Riggs,* 135 Mass. 238, 46 Am. Rep. 464.

At least one of the courts which employs the strict interpretation rule has expressed confidence in the other. Before quoting its words, we shall state the circumstances. In *In the Matter of Downie's Will,* 42 Wis. 66, the facts were: One Watson, at the request of Downie, wrote his will. After Downie had subscribed his signature his brother George signed as an attester "in the room where the deceased was, and in his immediate presence." Next, Watson signed, but did so in another room and out of range of vision of the testator. Then the following occurred: "Watson then sent into the other room, sat on the bed of the deceased, with the instrument in his hand, and said to deceased that he had signed it, as he supposed, in accordance with his wishes; and deceased replied that it was all right." Speaking of the circumstances, the court said:

"Neither is there any reason to doubt that the instrument expresses his real intention in regard to the disposition of his property after his death; and the record disclosed no ground for suspecting that any injustice would be done to his heir-at-law should the instrument be established as his last will. Indeed, the case is singularly free of those extraneous circum-

stances often present in such cases, which force the mind, however reluctantly, to contemplate possible wrong and injustice as the result of applying in its integrity a given rule of law."

The attestation was held invalid. We now come to the part of the decision to which we adverted above:

"* * * But the learned counsel for the respondent argued with great force against the rule, and eloquently appealed to us to overthrow it in this state and establish the more just and reasonable rule for which he contended. The well-known ability of the counsel, * * * prompted us to consider with much care whether this is a case which will justify us in overturning a specific rule of statutory construction established and upheld by such great weight of authority. We do not see our way clear to do so. We may concede that the rule is unsound in principle * * *.'"

The above will suffice as a review of the authorities. The contestant relies upon those which employed the strict interpretation rule, but this court, in *In re Estate of Shaff*, supra, embraced the liberal rule. The above review of the precedents was conducted, not for the purpose of re-examining the issue but to acquaint ourselves with the application of the statute.

■ We are, of course, satisfied that the attestation must occur in the presence of the testator and that no substitution for the statutory requirement is permissible. But we do not believe that sight is the only test of presence. We are convinced that any of the senses that a testator possesses, which enable him to know whether another is near at hand and what he is doing, may be employed by him in determining whether the attesters are in his presence as they sign his will. Had George been suddenly stricken blind instead of having become afflicted with an abdominal illness, the cir-

cumstances determining whether the attestation took place in his presence would have been no different. It is unnecessary, we believe, that the attestation and execution occur in the same room. And, as just stated, it is unnecessary that the attesters be within the range of vision of the testator when they sign. If they are so near at hand that they are within the range of any of his senses, so that he knows what is going on, the requirement has been met.

■ At least one of the objects of the statute was served in the present instance; that is, two disinterested persons were brought to the testator's bedside to be present while he executed his will. When two disinterested persons, who later tell the truth, are present, the testator has been afforded, in our opinion, the best protection against fraud that this statute is capable of yielding. As we have just said, as a result of the demands of this statute, Dr. Gillis and his wife came to George's bedside at the time when he signed. Later, one of the two signed her signature to the will within the testator's range of vision, voice and hearing. All that George had to do to see Mrs. Gillis sign was to look through the two doors which were in alignment between himself and her. A glance would enable him to see Mrs. Gillis, including her hand, while she wrote her signature. It should not be inferred that George was incapable of moving or sitting up; he could do either without assistance. Since the floor covering in all three rooms was linoleum, it seems fair to assume that footsteps in any of the rooms could be easily heard by the testator. The other attesting witness, like Mrs. Gillis, was within twenty feet of George's hand when the attesting signature was written. It is no misstatement of the fact to say that both witnesses were within

the immediate nearness and vicinity of the testator. Although Dr. Gillis was not within George's range of vision, he was within his range of voice and hearing. These three small rooms, if combined, would make nothing more than one room of fair length but of narrow width.

Present at the time were some of George's brothers, sisters and other relatives. Although George had not told them that the instrument under preparation was his will, he was surely justified in believing that they would not be entirely inattentive to his interests. Those are circumstances which can properly be considered, we believe, in determining whether Dr. Gillis signed in the presence of George. When the doctor signed he was within direct sight and almost within arm's reach of the relatives who were seated upon the waiting room davenport. Since much that was said about the preparation of the paper was heard by those who were in these small rooms, we feel justified in assuming that Dr. Gillis was within the range of George's voice when he signed. These circumstances, together with the fact that both of the Gillises throughout the entire evening were frequently in George's room and were available at all times at his beck and call, convince us that they were in his presence at the time when they signed their attesting signatures.

■ The question occurs whether George was conscious of the fact that Dr. and Mrs. Gillis were signing their attesting signatures at the moment when they wrote them. Consciousness of the fact that the attesting signatures are being written is an indispensable element of the conscious presence rule. In determining whether George was aware of the fact that the signatures were being written, we may properly take into

consideration, we believe, the fact that he had asked that the will be prepared, and that both of the Gillises were present when he signed. Undoubtedly, the request for the preparation of a will, under the circumstances disclosed by the record, carried with it an implied request for an attestation. Therefore, since Dr. Gillis' wife was present with her husband at the moment when George signed, he must have known that those two persons would shortly sign as attesters. We may also take into consideration the fact that two or three days later, while referring to the attestation of the will, he said, "I know that Doc did." Just before making that remark he was assured that Mrs. Gillis had signed and that, in compliance with his request, the will had been deposited in a safe repository. As previously stated, Mrs. Gillis was within the direct range of George's vision when she signed. It seems safe to infer that in a small space of the kind with which we are concerned the attention of a testator, who had just signed a will, would be attracted when he saw his two attesting witnesses go into an office room and there, taking pen in and, proceed to use it. George lay upon his back at least a part of the time that evening. These circumstances persuade us that George was conscious of the attestation when it took place.

■ We realize that in having reached these conclusions we have gone as far as any of the precedents. But the circumstances repel any thought of fraud and speak cogently of the integrity of the instrument under review. The signatures of all three persons are conceded. The circumstances of the attestation are free from dispute. The will is written upon a single sheet of paper and, hence, afforded no opportunity for the substitution of a fraudulent paper. As previously stated, the will

was written, executed and attested within the observation and within arm's length of some of the testator's brothers, sisters and relatives. If they did not know the nature of this instrument, they must have been deficient in the power of deduction. One of them intimated that she thought the paper had something to do with the anticipated operation. The facts that George was a man of mature years and that all were excluded from the room when George gave directions for the paper's preparation are hostile to that supposition. Again, the fact that the street and post office addresses of Mrs. Fuller, the testator's favorite sister, were given to Dr. Gillis, must have been an intimation to those in the waiting room of the nature of the paper in preparation. We repeat, the will was prepared, executed and attested in the very presence of those who now attack it, and that the latter were so placed in the room that if any suspicious movement had taken place it would have been observed. Very likely Dr. Gillis left both doors open all evening, except for the few moments when George asked for privacy, so that George's relatives and friends could see for themselves what was going on. The will was written in accordance with a plan which the testator had entertained for a considerable period of time for the distribution of his bounty, and the plan did no violence to any duty he owed. To defeat the will would completely defeat the testator's purpose. If the will were defeated, the testator's estate would go to his father, whom George, whether rightly or wrongly, had decided should receive nothing; and, since the father died shortly after George's death, virtually all of the estate would be distributed to those who had taken sides against George when he took his mother's part in the family controversy. Ida Fuller

would receive one dollar. We have said enough to indicate that the record contains no evidence of fraud, overreaching or of any suspicious conduct.

■ In conclusion, we express the belief that if Dr. Gillis and his wife failed to comply with the strict letter of the statute when they attested the will, they, nevertheless, substantially complied with its requirements. To hold otherwise would be to observe the letter of the statute as interpreted strictly, and fail to give heed to the statute's obvious purpose. Thus, the statute would be turned against those for whose protection it had been written. The circuit court, in sustaining the will, committed no error.

■ The evidence reviewed above convinces us, as it did the trial judge, that the testator knew the contents of the will before he signed it, and, further, that if he did not know the identity of both attesters at the moment when he signed, he discovered the name of the unfamiliar one two or three days later and then expressed his approval.

The above disposes of all issues presented by the contestant. The circumstances, therefore, afford no occasion for an expression of our views upon other matters.

The decree of the circuit court is affirmed.

KELLY, C. J., and RAND and BELT, JJ., concur.

BAILEY, J., dissents.

BEAN and LUSK, JJ., took no part in this decision.