Argued and submitted June 2, affirmed on appeal and cross-appeal November 25, 1998, both petitions for review denied March 23, 1999 (328 Or 365)

In the Matter of the Estate of
Margaret Edith Kirkeby, deceased.

Glenn W. KIRKEBY,
personal representative of the Estate of
Margaret Edith Kirkeby, deceased,
*Respondent,*

*and*

Glenn W. KIRKEBY,
personal representative of the Estate of
Orrin G. Kirkeby, deceased,
and Glenn W. Kirkeby, individually,
*Respondents - Cross-Appellants,*

*and*

MILLE LACS HEALTH SYSTEM,
*Respondent - Cross-Respondent,*

*v.*

COVENANT HOUSE,
Donald E. Curtis and Gayle R. Lyman,
*Appellants - Cross-Respondents.*

(2546; CA A96125)

970 P2d 241

Rees C. Johnson argued the cause for appellants - cross-respondents. With him on the briefs were Dale D. Mammen and Shannon & Johnson.

George W. Kelly argued the cause and filed the brief for respondents - cross-appellants.

Douglas E. Hojem argued the cause for respondent - cross-respondent. With him on the briefs was Corey, Byler, Rew, Lorenaen & Hojem.

No appearance for respondent Glenn W. Kirkeby, personal representative of the Estate of Margaret Edith Kirkeby, deceased.

Before DeMuniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

## HASELTON, J.

This appeal and cross-appeal arise from an unusually convoluted probate dispute. The central issue on appeal is whether the trial court erred in determining that the testator's 1992 will was invalid because it was not acknowledged "in the presence" of witnesses. ORS 112.235(1)(c). The primary, albeit not exclusive, issue on cross-appeal is whether the court erred in determining that a statutory election, ORS 114.105, signed by the testator's husband but not filed until after the husband had himself died, was ineffective. We conclude that the trial court correctly resolved those and other disputed matters. Accordingly, we affirm on both the appeal and the cross-appeal.

On *de novo* review, *Williams v. Overton*, 76 Or App 424, 709 P2d 1115 (1985), *rev den* 300 Or 563 (1986), the material facts are as follows: The testator, Margaret Kirkeby (Margaret) and her husband, Orrin, were residents of the northeastern Oregon town of Wallowa. In May 1989, Margaret executed a will that provided that the proceeds of her estate be placed in trust, with "income earnings" to be distributed to Orrin during his life, then to other beneficiaries for a period not to exceed five years. The corpus was then to be distributed to a named charitable beneficiary, Mille Lacs Health System (Mille Lacs),[1] one of the respondents on appeal.

In June 1992, Margaret decided to revise some of the provisions of the 1989 will. She drafted a handwritten codicil dated June 10, 1992, which, among other things, included a specific bequest of the Kirkebys' home, including five acres of land, to two neighbors, Don Curtis and Gayle Lyman, in exchange for them providing physical care for both Margaret and Orrin until their deaths. However, the codicil was not properly executed, ORS 112.235.[2]

In July 1992, Margaret again decided to change her will. After marking through the 1989 will and codicil and adding notes, she asked Gayle Lyman to type up a new will

---

[1] The will actually read "Bethany Home (Mille Lacs Nursing Home in Onamia, Minnesota 56359)."

[2] On appeal, no party disputes the probate court's determination that the codicil was invalid.

with the indicated changes. On July 15, 1992, Lyman took the document to her house, typed it on two pages and delivered it to Margaret, who signed it that same day. That 1992 will, although still providing that the assets be placed in trust with income distributions to Orrin for life, and then to other named beneficiaries, provided that the trust corpus be distributed to a different named charitable beneficiary, Covenant House. It also incorporated the specific bequest of the Kirkebys' house and land to Curtis and Lyman, which had been originally set out in the ineffective June 1992 codicil.

On July 15, after signing the will, Margaret telephoned Patricia Horton, a local notary whom she knew. Horton returned Margaret's phone call later that day, and Margaret, whose voice Horton recognized, told Horton that she had signed a document, that she wanted Horton to notarize it, and that Lyman would be bringing it to Horton's office. Still later on July 15, Lyman delivered the document to Horton who recognized Margaret's handwriting and notarized the second page. Horton did not know that the document was a will, and she did not see the first page, because it was not attached. Lyman then returned the document to Margaret.

Although the dates are somewhat in dispute, it appears that 10 days later, on July 25, Margaret asked Lyman if she had had the will witnessed. Lyman replied that she had not and took the will to her house to type "witness" lines on the second page. Apparently while Lyman was gone, Margaret called Hazel Ortega, another neighbor. Margaret told Ortega that she had signed her will and that she wanted Ortega to witness it. Ortega arrived at Margaret's house, but Lyman had not yet returned with the will, so Ortega went home. When Lyman returned to Margaret's house, Margaret told her to take the will to Ortega's house. Lyman then took the second page of the document to Ortega, who signed as "witness." Another neighbor, James Pullen, also signed as a witness; unlike Ortega, he had not spoken to Margaret about the instrument or about signing as a witness.[3] Once all the signatures were on the document, Lyman placed it in Margaret's satchel next to her bed.

---

[3] Although there is some dispute over whether Ortega or Pullen signed first, that is not material to our consideration.

Margaret died on September 2, 1992. In October 1992, Glenn Kirkeby (Glenn), Orrin's brother, filed a petition in probate alleging that the 1992 will was invalid as "not properly attested in that decedent did not sign her Will in the presence of the witnesses nor did she acknowledge to said witnesses that she had signed her Will," and that, consequently Margaret had therefore died intestate. Covenant House, Lyman, and Curtis, as named beneficiaries of the 1992 will (hereinafter, "objectors"),[4] filed objections to Glenn's petition, alleging that the 1992 will was valid or, in the alternative, that Margaret's 1989 will and the June 10, 1992 codicil were valid.

■■ In June 1993, the court issued a memorandum opinion and subsequent order, determining that (1) the July 1992 will and the June 1992 codicil to the 1989 will were both invalid as improperly executed; but (2) Margaret did not die intestate because, applying the doctrine of "dependent relative revocation,"[5] the 1989 will remained valid. The court's memorandum included the following pertinent findings and conclusions:

"The 1989 will is marked up and provisions are crossed out, but it is still legible.

"* * * * *

"The 1989 will is valid unless it was revoked. It is also clear to the Court that is was Decedent's intent to revoke the 1989 will and replace it with the 1992 will.

"Therefore, if the 1992 will is valid, there is no need to inquire further.

"The 1992 Will:

"Mrs. Horton's and Mr. Pullen's testimony and affidavits do not meet the requirements of the law to prove a will.

---

[4] Covenant House and Curtis objected to the initial petition. Lyman later joined in their objections.

[5] Under the doctrine of dependent relative revocation, a court can probate a will that was revoked by a testator through the execution of a subsequent will where that subsequent will is later declared invalid. The applicable principle is that the court may declare the revoked will valid, if it determines that the testator did not intend to die intestate and would not have revoked the prior will if he or she had known that the subsequent will would prove to be invalid. *See Flanders v. White,* 142 Or 375, 389, 18 P2d 823 (1933).

"Mrs. Ortega's testimony and affidavit does meet the requirement to prove a will.

"* * * * *

"Under the facts as found above by the Court, the 1992 will is simply not provable as a valid will under the law.

"Deceased certainly intended her estate to pass under a will and would not have revoked her 1989 will if she had realized that the 1992 will was not valid. The essential dispositions of these two wills are the same.

"The doctrine of dependent relative revocation applies. * * *

"The 1989 will is the valid Last Will of Decedent and shall be admitted to probate."

On June 25, 1993, the court entered its order admitting the 1989 will to probate.[6]

On June 29, 1993, Orrin signed an election as the surviving spouse to take against Margaret's will, ORS 114.105, but instructed attorney William Kirby to "hold" the document and not to file it.[7] On July 13, 1993, Orrin died. On August 30, 1993, at Glenn's direction, Kirby, who was both Glenn's attorney and the attorney for Margaret's estate at that time, filed the written election.[8] That filing occurred within 90 days of the order admitting the 1989 will to probate. ORS 114.145.

In December 1997, after protracted additional proceedings, the probate court entered a comprehensive and detailed Decree of Final Distribution. That judgment reiterated that Margaret's 1989 will was "the valid will of the decedent" and also adjudicated three matters that underlie the

---

[6] Mille Lacs Health System, which was a named beneficiary under the 1989 will, did not appear and participate in this proceeding until after the 1989 will was admitted to probate.

[7] There is some dispute as to whether Orrin, who had limited ability to speak because of health problems, intended Kirby to "hold" the election temporarily or "hold" the election until Orrin instructed him to file it.

[8] It is unclear from the record whether Glenn gave that directive in his individual capacity, or in his capacity as the personal representative of Orrin Kirkeby's estate. Either characterization does not affect our analysis or disposition as to the effect of the putative election. See 157 Or App at 322-23.

cross-appeal: (1) The written election, signed by Orrin on June 29, 1993, but filed after his death, was not effective under ORS 114.105. (2) The so-called "Meleen note"[9] was properly included as an asset of Margaret's estate. (3) The provision in the 1989 will for the distribution of "income earnings" to Orrin for life and then to other beneficiaries for five years was "net income" and thus subject to certain deductions and administrative expenses before distribution. ORS 116.007; Oregon Uniform Principal and Income Act, ORS ch 129.

All parties appeal or cross appeal. The "objectors"— Covenant House, Curtis, and Lyman—as putative beneficiaries of the 1992 will, appeal, challenging the court's conclusion that that will was not properly acknowledged. Mille Lacs, a beneficiary under the 1989 will, but not under the 1992 will, resists the appeal. Glenn Kirkeby, who is, nominally, a respondent on appeal, takes no position on the merits of that dispute. Conversely, Glenn, individually and as Orrin's personal representative, cross-appeals, challenging the three determinations described in the previous paragraph, and Mille Lacs, joining forces with Covenant House, Curtis, and Lyman, resists the cross-appeal. We deconstruct that tangle of issues and cross-cutting interests, strand by strand, beginning with the appeal.

Objectors argue that the 1992 will was properly executed, ORS 112.235, because Horton, the notary, and Ortega, the neighbor, were both proper witnesses.[10] In particular, objectors assert that Margaret properly acknowledged the 1992 will to both Ortega and Horton when she: (1) telephoned them, (2) told them that she had signed the will, and (3) told them that Lyman was bringing the instrument over for each to attest. Respondent Mille Lacs counters that the court properly declared the 1992 will invalid, even assuming that Horton's signature as a notary was sufficient to meet the witness requirements of ORS 112.235, because Margaret did not properly acknowledge her signature "in the presence" of either witness, as that term has been construed under

---

[9] Given our disposition of that matter on cross-appeal, 157 Or App at 321, a detailed recitation of its particulars would be superfluous.

[10] No party argues that Pullen was a proper witness.

Oregon law. *See, e.g., In re Demaris' Estate,* 166 Or 36, 71-74, 110 P2d 571 (1941).

Assuming, without deciding, that Horton signed as a witness and not merely as a notary, we agree with respondents that the 1992 will was invalid and that the 1989 will was properly probated.[11] As amplified below, the execution of Margaret's 1992 will did not comply with ORS 112.235, because Margaret's "acknowledgment" of her signature via the telephone in the circumstances presented here, was not "in the presence" of either of the witnesses, much less both.

ORS 112.235 provides, in part:

"A will shall be in writing and shall be executed with the following formalities:

"(1)₊ The testator, *in the presence of each of the witnesses,* shall:

"* * * * *

"(c) *Acknowledge the signature previously made* on the will by the testator * * *.

"* * * * *

"(3) At least *two witnesses* shall each:

"* * * * *

"(b) *Hear the testator acknowledge the signature on the will; and*

"(c) Attest the will by signing the witness' name to it." (Emphasis added.)

The "in the presence" requirement for acknowledgment by the testator was first codified in 1969,[12] *see* Or Laws

---

[11] No party disputes the trial court's conclusion that, under the doctrine of "dependant relative revocation," *see* n 5, if the 1992 will was invalid, then the 1989 will is valid.

[12] Although the original statutes pertaining to execution of wills, *see* General Laws of Oregon, ch 62, § 4, p 936 (Deady 1845-1864), did not specifically require that the testator "acknowledge" the signature previously made, the Supreme Court, in 1890 looked to the general statute regarding the witnessing of an instrument, General Laws of Oregon, ch 8, § 747, p 334 (Deady 1845-1864), when determining whether a witness properly attested a will and held:

"A subscribing witness to a will, therefore, must be something more than a person who subscribes his name as a witness to it. The testator must either

1969, ch 591, § 37, and has never been explicitly construed in a reported Oregon decision. *Cf. Perry v. Adams,* 112 Or App 77, 82, 827 P2d 930 (1992) ("The statute requires that witnesses be present when the testator signs the will or acknowledges the signature on the will."). However, before 1973, ORS 112.235 and its predecessor also included the requirement that attestation *by the witnesses* take place "in the presence of the testator and at his request." *See* ORS 112.235(3)(c) (1969).[13] In several cases, most notably, *Demaris' Estate,* the Supreme Court construed the meaning of "in the presence" in that context and concluded that attestation was valid so long as the witnesses were in the testator's "conscious presence." *Demaris' Estate,* 166 Or at 74.

In *Demaris' Estate,* the testator made out his will with the assistance of his doctor. The doctor and the doctor's wife were present when the testator signed the will. However, 20 to 30 minutes later, and in a room 20 feet from where the testator lay, the doctor and his wife, as attesting witnesses, signed the will. Because of the layout of the office, the testator could not physically see the doctor witness the will, but he could have seen the doctor's wife, had he adjusted his position slightly. A contestant of the will argued that, in those circumstances, the statutory requirement that the witness sign "in the presence" of the testator had not been satisfied. The court, after noting "it is essential, not only that the signatures be genuine and that they be found upon an instrument which all three persons intended to sign, but also that the attesters signed in the testator's presence," *id.* at 58-59, concluded:

"We are, of course, satisfied that the attestation must occur in the presence of the testator and that no substitution for the statutory requirement is permissible. But we do not believe that sight is the only test of presence. We are convinced that any of the senses that a testator possesses,

---

sign the will in the presence of the witness, or must acknowledge to him by word or act that he had signed it. It is not necessary that the witness know the contents of the instrument subscribed by him, or its nature or character, but he must be able to testify that the principal in the affair put his name upon the identical piece of paper upon which he placed his own." *Luper v. Werts and Smith,* 19 Or 122, 135, 23 P 850 (1890).

[13] That requirement was eliminated as part of an omnibus revision of the Probate Code in 1973. Or Laws 1973, ch 506, § 7.

which enable him to know whether another is near at hand and what he is doing, may be employed by him in determining whether the attesters are in his presence as they sign his will. * * * It is unnecessary, we believe, that the attestation and execution occur in the same room. And, as we just stated, it is unnecessary that the attesters be within the range of vision of the testator when they sign. If they are so near at hand that they are within the range of any of his senses, so that he knows what is going on, the requirement has been met." *Id.* at 71-72.

*See also In re Estate of Shaff,* 125 Or 288, 296, 266 P 630 (1928) (where the testator could have seen the witnesses, who were standing on the other side of a partition, affix their signatures had he "slightly exerted himself," the "presence" requirement was met).

■■ ˙ Respondent Mille Lacs argues that the same "conscious presence" principle necessarily applies to the "in the presence" requirement with respect to testator's acknowledgment of a previously made signature. In particular, Mille Lacs suggests that the "in the presence" requirement is designed to avoid "bait and switch" tactics, *cf. In re Estate of Shaff,* 125 Or at 295,[14] and that that purpose is effectuated only if there is "concurrence in time and place" between (1) the testator's acknowledgment of the signature to each of the witnesses and (2) the presentation of the instrument to the witnesses. Thus, respondent reasons:

"[T]he presence requirement of ORS 112.235 * * * requires not only the presence of the testator and witness, but also implicitly requires the presence of the will. To put it another way, a signature can't be acknowledged to a witness if the signature isn't available to be perceived by the witness. The will must be present for the witness to know what signature on what document is being acknowledged."

We agree with respondent that to satisfy the "in the presence" requirement of ORS 112.235(1)(c), the will, bearing the signature that the testator acknowledges, must be before

---

[14] In *In re Estate of Shaff,* the court observed:

"The reason of the rule * ˙ * is to obviate any opportunity of the witnesses committing a fraud upon the testator, by changing or altering the document * ˙ ˙ *." 125 Or at 295.

the witness at the time of the acknowledgment. Even if we were to assume that telephonic acknowledgment would otherwise satisfy the "in the presence" requirement—a question we do not resolve today—an "acknowledgment" made to a witness who cannot perceive what is being "acknowledged" is meaningless. If the "in the presence" requirement is to have any context, it must require *at least* the "concurrence" of the testator's acknowledgment and the witnesses' "perception."

■ Applying that principle here, neither Horton nor Ortega validly witnessed Margaret's "acknowledgment." In neither instance did the witness have the 1992 will before her at the time Margaret spoke with her. Thus, neither Ortega nor Horton was close enough at hand to have known that the instrument, which was later presented to them, was, in fact, the instrument upon which Margaret had previously "acknowledged" her signature, or whether Margaret had actually signed that instrument at the time she stated her "acknowledgment."

■■ Objectors argue, nevertheless, that we should resort to remedial principles of "substantial compliance" in this case because the validity of Margaret's signature is undisputed; because the 1992 will did, in fact, comport with Margaret's long-standing testamentary intent; and because "[n]o party has raised any question of fraud * * * or any question about [Margaret's] competence." Whatever the ultimate accuracy of those assertions,[15] "substantial compliance" does not mean noncompliance, and the fact that the testator's and witnesses' signatures may be genuine does not obviate other express statutory requirements. *See Demaris' Estate,* 166 Or at 58-59 ("[I]t is essential, not only that the signatures be

---

[15] Respondent Mille Lacs does take issue with the second and third of those propositions and notes, with reference to the potential for fraud, that:

"No witness was ever given or shown the first page of the 1992 will being proposed by Covenant House, Curtis and Lyman. Moreover, the person in charge of the witnessing of the will, and who chose not to reveal the first page of it to the witnesses, was a beneficiary, *i.e.,* Ms. Lyman. Her bequest in the 1992 will appears on that undisclosed first page.

"* * * * *

"If there was a switch of the first page of the 1992 will, it could go undetected because it was Ms. Lyman's typewriter that was used to type the will."

genuine and that they be found upon an instrument which all three persons intended to sign, but also that the attesters signed in the testator's presence."). The trial court did not err in admitting the 1989 will to probate.

We proceed to the cross-appeal by Glenn Kirkeby, individually and as Orrin's personal representative. The cross-appeal raises three assignments of error: (1) The trial court erred in failing to give effect to the written election pursuant to ORS 114.105 that Orrin signed before his death but that was filed after his death. (2) The court erred in probating the "Meleen note" as the property of Margaret's estate, rather than determining the note to be joint tenancy property not subject to probate. (3) The court erred in treating the distribution of "interest earnings" under Margaret's will to be a distribution of net, rather than gross, income.

For the reasons described in the cross-respondents' briefs, including certain representations and admissions by Orrin as to the ownership of the "Meleen note," we reject the second assignment of error without further elaboration. We proceed to the other two.

The disposition of the first assignment of error turns on the proper construction of ORS 114.105 and ORS 114.145. ORS 114.105 provides, in part:

"(1) If a decedent is domiciled in this state at the time of death and dies testate, the *surviving spouse* of the decedent has a right to elect to take [against the will] the share provided by this section." (Emphasis added.)

Here, it is undisputed that Margaret was domiciled in Oregon at the time of her death and, as determined above, that she died testate. Thus, Orrin, as the surviving spouse, could elect to take against Margaret's will.

ORS 114.145 provides that the "surviving spouse is considered to have elected to take *under the will*" unless,

"within 90 days after the date of the admission of the will to probate or 30 days after the date of the filing of the inventory, whichever is later, *the surviving spouse serves* on the personal representative or the attorney of the personal representative *and files* in the estate proceeding a statement that the surviving spouse elects to take under ORS 114.105

instead of under the will. The *surviving spouse* may bar any right to take under ORS 114.105 by filing in the estate proceeding a writing, signed by the spouse, electing to take under the will." (Emphasis added.)

Cross-appellant argues that a surviving spouse's right to elect against the will of the deceased spouse, ORS 114.105, is a "property right" that, upon Orrin's death, passed to his estate, which, in turn, could file the election, ORS 114.145. Cross-respondents respond, *inter alia,* that "an election to take against a will is a right personal to the surviving spouse that expires if not exercised during his or her life."[16]

The text of ORS 114.105 and ORS 114.145 specifically provides that the "surviving spouse" may make, serve, and file the election. There is nothing in those provisions that suggests that the election can be served or filed by any other person, including the heirs of the surviving spouse. *See* ORS 174.010 (court is not to "insert what has been omitted, or to omit what has been inserted").

The statutory context confirms that construction. ORS 114.155 provides:

"An election under ORS 114.105 may be filed on behalf of a financially incapable surviving spouse by a court acting under ORS 125.650 [exercising any power that could be exercised by guardian or conservator to enter protective order] or by the conservator of the estate of the spouse. The court or conservator may elect against the will only if additional assets are needed for the reasonable support of the surviving spouse, taking into account the probable needs of the spouse, the provisions of the will, any nonprobate property arrangements made by the decedent for the support of the spouse and any other assets, whether or not owned by the spouse, available for such support. The election is subject to the approval of the court, with or without notice to other interested persons."

Implicit in that provision are two operative principles. First, to the extent the legislature intends to permit any exceptions to the general requirement that the election must be served

---

[16] Cross-respondents also emphasize that Orrin told Kirby, the attorney, to "hold" the election and not to file it.

and filed by the surviving spouse, it does so explicitly. ORS 114.155 is the only such statute. Second, and in all events, the election is ultimately for the surviving spouse's financial benefit and, thus, must be filed during the surviving spouse's lifetime.

We note, finally, that, to permit the personal representative of the surviving spouse to exercise the statutory election could—as it would here—permit the heirs of that spouse to frustrate the testamentary scheme of the decedent spouse. ORS 112.227 provides:

"The intention of a testator as expressed in the will of the testator controls the legal effect of the dispositions of the testator. The rules of construction expressed in this section, ORS 112.230 and 112.410 apply unless a contrary intention is indicated by the will."

Obviously, the statutory election mechanism of ORS 114.105 qualifies ORS 112.227 by permitting a surviving spouse to at least partially modify or defeat the decedent's testamentary scheme. Nevertheless, nothing in ORS 114.105, or in the Probate Code generally, suggests that that statute can be employed as a device for one spouse's heirs to profit at the expense of the others, subverting ORS 112.227.

We thus conclude that the right of election was personal to Orrin and could only be exercised during Orrin's lifetime. *Cf. Varner et al. v. Portland Trust Bank,* 210 Or 658, 664, 313 P2d 444 (1957) ("[A] probate homestead itself and its enjoyment are creatures of claim and unless exercised by those entitled to do so and at the time and in the manner provided by statute, the probate homestead and its incident of ownership, possession and enjoyment are lost."). Accordingly, the trial court did not err in refusing to give effect to the purported election.[17]

■    The final assignment of error on cross-appeal challenges the court's treatment of the distribution of "interest earnings" under the 1989 will as net, not gross, income. In so holding, the trial court concluded that "[t]he decedent

---

[17] Our conclusion in that regard comports with decisions from many other jurisdictions. *See* 83 ALR 2d 1077, *Will—Election by Agent of Spouse,* § 2 (1962).

intended the words 'net income' when using the word 'earnings' and, thus, under ORS 116.007, those earnings were subject to reduction against certain expenses before distribution."

ORS 116.007(2) provides, in part:

"Unless the will otherwise provides, income from the assets of a decedent's estate after the death of the testator and before distribution, including income from property used to discharge liabilities, shall be determined in accordance with the rules applicable to a trustee under ORS 129.005 to 129.125 * * *."

ORS 129.115(1) provides, in part:

"The following charges shall be made against income:

"(a)   Ordinary expenses incurred in connection with the administration, management, or preservation of trust property, including regularly recurring taxes, except deferred real property taxes, assessed against any portion of the principal, water rates, premiums on insurance taken upon the interests of the income beneficiary, remainderman, or trustee, interest paid by the trustee, and ordinary repairs."

The pertinent provision of the 1989 will reads:

"I, Margaret E. Kirkeby, hereby make my last will and testament. I place all my assets—monetary, and proceeds from real estate and property in trust. The interest earnings from this trust I will to my husband, Orrin G. Kirkeby, to be paid to him monthly.

"* * * * *

"After the death of Orrin G. Kirkeby the interest earnings from the trust will be dispersed as follows not to exceed a 5 yr. period.

"[1/3 each to Helen Moore, Glenn Kirkeby, and Leo Maiers]."

The term "income earnings" is innately ambiguous—without further elaboration, definition, or contextual guidance, it could refer either to gross earnings or net earnings. *See generally Loomis v. MacFarlane,* 50 Or 129, 91 P 466 (1907). There is no evidence in this record from which the

trial court, or we, could confidently divine which of those meanings Margaret might have intended. Without such proof, we cannot say that the 1989 will, contrary to the general presumption of ORS 116.007, "otherwise provid[ed]" that interest income was not to be subject to reductions for expenses pursuant to ORS 129.005 to ORS 129.125. Thus, the trial court did not err.

Affirmed on appeal and cross-appeal.