Argued and submitted January 5, 2001, reversed and remanded with instructions
June 5, 2002

In the Matter of the Estate of
Luella May Sommers, Deceased.

Sharon Lee Walker,
Personal Representative of the Estate of
George P. WALKER, Deceased,
*Appellant,*

*v.*

Robbie ROBERDS,
Personal Representative of
the Estate of Luella May Sommers, Deceased,
and Theodore R. Sommers,
*Respondents.*

P97-10-22; A105599

47 P3d 911

William K. Keller, Judge pro tempore.

Kristin Winnie Eaton argued the cause for appellant. With her on the briefs were A. Gregory McKenzie and A. Gregory McKenzie & Associates.

Gerald A. Martin argued the cause for respondents. With him on the brief was Francis & Martin.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

The decedent, Luella Sommers, died in September 1997, leaving three sons and two disputed wills. Respondent Robbie Roberds filed a petition for the probate of a will executed by Luella in March 1996. The court accepted the will for probate and appointed Roberds as personal representative. The March 1996 will left Luella's entire estate, with the exception of $500, to Theodore Sommers (Sommers), Luella's son by her second marriage.[1] Petitioner George P. Walker (Walker), Luella's son by her first marriage, initiated this proceeding challenging respondent's probate of the 1996 will. He offered into probate a 1997 will naming his wife Sharon Walker as personal representative and splitting the remainder of the estate equally between Walker and Sommers. In the alternative, he challenged the 1996 will as having been obtained through the undue influence of Sommers. The trial court probated the March 1996 will and invalidated the March 18, 1997, will on the ground of undue influence, and Walker appeals. On *de novo* review, *Kirkeby v. Covenant House*, 157 Or App 309, 970 P2d 241 (1998), *rev den* 328 Or 365 (1999), we reverse the judgment and remand the case for probate of the 1997 will.[2]

From the time of her husband's death in 1991 to her own death in September 1997, Luella executed six wills:

|    | Date | Distribution |
| --- | --- | --- |
| 1. | 2/12/92 | Louis - $500<br>Walker - remainder<br>Sommers - alternate remainder |
| 2. | 6/24/92 | Louis - $500<br>Walker - remainder<br>Sommers - alternate remainder |

[1] The third son is Louis Walker, whose father is Luella's first husband. Luella and Louis did not maintain a relationship with each other. Louis received the $500 bequest and is not a party to this proceeding.

[2] Walker died while this case was pending on appeal, and his personal representative, Sharon Walker, was substituted as the petitioner. For clarity, we will refer to the petitioner in this case as Walker.

3.    4/15/94    Louis - $500
                      Walker - ½ remainder
                      Sommers - ½ remainder

4.    1/22/96    Louis - $500
                      Walker - ½ remainder
                      Sommers - ½ remainder

5.    3/6/96    Louis - $500
                      Walker - Nothing
                      Sommers - entire remainder

6.    3/17/97    Louis - $500
                      Walker - ½ remainder
                      Sommers - ½ remainder

The last two wills are the disputed documents. We refer to the March 1996 will as the 1996 will and the March 1997 will as the 1997 will.

Most of the facts are undisputed. Luella and her late husband lived in Nehalem, Oregon. Roberds was a close family friend who assisted Luella with her financial affairs after her husband's death in May 1991. She gave him a power of attorney in May 1996 and frequently consulted with him about her financial decisions. He held several of her certificates of deposit.

Luella had a heart condition that left her short of breath. Beginning about one year after her husband's death, Luella lived with Walker, his wife Sharon, and their children in their home in Oregon City. There, she had a private bedroom with a lock on the door, her own television and satellite dish, and her own telephone line. When she was feeling well, she cooked for the family and gardened. Luella did not drive, so she was dependent on Walker and Sharon for her transportation for shopping and appointments.

In January 1996, Luella and Walker had an argument that caused Luella to move into Sommers' house in Tillamook County. Sommers testified that he did not know the exact nature of Walker and Luella's disagreement, only that at the time she came to stay with him she was angry at Walker. It was during her four-month stay with Sommers that Luella executed the 1996 will disinheriting Walker and

gave Roberds a power of attorney. At that time, she also removed Walker's name from joint bank accounts. Sommers knew that Luella had made a new will, but he did not know its contents. He did not advise Walker of the existence of the new will. Sommers' home was not large, and in May 1996 Luella moved back to Walker's home so that she could have more space and be closer to her doctors.

According to Walker and Sharon, Luella and Walker had a good relationship generally, with occasional disagreements. According to Roberds and Sommers, Luella expressed fear of Walker. Medical records of emergency room hospital visits from July 1996 through December 1996 confirm that on several occasions Luella told medical personnel that the stress of arguments with Walker had caused her to experience chest pains, that she was afraid of Walker, and that she was concerned that he might hurt her or take her property. Those documents also show that Walker acknowledged that Luella would provoke him to anger and that he had difficulty controlling his temper. The nature of their disagreements is not completely clear, but some seem to have related to finances. During late 1996, Walker and Sharon were separated and Sharon was not living in the home, so only Walker and Luella were in the home. Luella spent three weeks in a foster home following one hospital visit because she did not want to return to Walker's home. From medical and social service documents reporting Luella's and Walker's contacts, their relationship during this time can be described as tumultuous.

At the end of December 1996, after several visits to the emergency room, Luella's failing health forced her to move permanently out of Walker's home and into an assisted living facility. After that time, Luella had little contact with or from family members other than Walker and his family. Luella called Roberds in December 1996 or January 1997 and asked him to relinquish his power of attorney. He returned her certificates of deposit to her, which at that time totaled approximately $120,000. Walker was Luella's primary family contact for physicians and social service personnel. He and Sharon visited Luella several times a week and spoke to her daily on the telephone. Sharon testified that in March 1997 Luella received a telephone call from an attorney at the

coast who had prepared an earlier will, asking that she come and sign it. This angered Luella and apparently motivated her to make a new will. At Luella's request, Walker took Luella to attorney McKenzie, who had drafted a will for her in 1994, for the purpose of making a new will. On March 18, 1997, she executed the will that Walker offered for probate.

Walker and Sharon testified that they did not know the contents of the 1997 will until several months after its execution and did not know about the 1996 will until after Luella's death in September 1997. Sommers and Roberds testified that they did not notify Walker that the 1996 will had been executed and did not know the contents of the 1996 will or of the existence of the 1997 will. At the time of her death, Luella's primary assets were her certificates of deposit totaling approximately $44,000.

There is no dispute that the 1996 and 1997 wills were both validly executed. There is no contention that Luella lacked the mental capacity to execute either will. The parties raise only their mutual contentions that the will that they challenge was the subject of undue influence.

In evaluating first Roberds' contention that the 1997 will was executed as a result of Walker's undue influence, we bear in mind that the burden of proving undue influence is on Roberds. *In re Reddaway's Estate*, 214 Or 410, 418, 329 P2d 886 (1958); *Sangster v. Dillard*, 144 Or App 210, 216, 925 P2d 929 (1996), *modified* 146 Or App 105, 931 P2d 815 (1997). Roberds can meet that burden by raising an inference of undue influence by virtue of evidence establishing (1) the existence of a confidential relationship between Walker and Luella, (2) Walker's dominance over Luella, and (3) the presence of suspicious circumstances surrounding the execution of the will. *Sangster*, 144 Or App at 216. We have considered the evidence anew and find that Walker and Luella had a confidential relationship and that he dominated her by reasons of their personalities and her weakened health. For the following reasons, however, there were no suspicious circumstances surrounding the execution of the will. In evaluating whether suspicious circumstances existed surrounding the execution of the 1997 will, we consider each of the factors discussed in *Reddaway*, 214 Or at 421-26.

■ The first *Reddaway* factor is the participation of the beneficiary in the preparation of the will. Here there is no evidence that Walker participated in the preparation of the 1997 will. Although Walker drove Luella to the lawyer's office, he sat in the waiting room and did not know the will's contents until several months after its execution.

■ The second factor is a lack of independent and disinterested advice regarding the will. In this case, Luella sought and obtained independent and disinterested legal advice in the preparation of the 1997 will. There is evidence that attorney McKenzie had represented both Luella and Walker in the past, but there is no evidence that that representation influenced his independence or ability to advise Luella objectively in the drafting of a will.

■ We next consider whether there was secrecy and haste in the making of the will. There is no evidence that the will was executed in secrecy or in haste. Neither Sommers nor Roberds was informed of the 1997 will, but Luella and Sommers were not in regular contact with each other at that time.

■ Suspicion can be aroused by unexplained changes in the donor's attitude toward those for whom she had previously expressed affection. Here, the 1997 will, which returned to Luella's earlier disposition splitting her property between her two sons, does reflect a change, but it does not reflect a negative change toward any of her former intended beneficiaries.

Another factor is a change in the testamentary plan that ignores the natural objects of the testator's bounty or disregards the continuity of purpose running through former testamentary dispositions. The 1997 will returned to the previous disposition splitting Luella's property between Walker and Sommers, which had been Luella's testamentary plan in the two wills preceding the will executed in 1996.

■ We next consider whether the challenged will made an unnatural and unjust gift. The 1997 will reflected a natural disposition of Luella's interests. Although Luella and Walker had problems when she was living in his home, their relationship improved when she moved out. He was the only

family member who kept in contact with her in her final months; he was the primary family contact for medical personnel. Her decision not to disinherit him as provided in the 1996 will and instead to split her estate between Walker and Sommers was a natural one.

■       Finally, we examine the donor's susceptibility to influence. There is evidence from which it can be inferred that, at the time she executed the 1997 will, Luella was physically dependent on those around her because of her weakened health. She was in a care center and her physical needs were met there. Walker continued to provide other assistance, such as transportation to appointments.

The trial court found that Luella's susceptibility to influence was a suspicious circumstance in the execution of the will, focusing primarily on Luella's weakened physical state and Walker's aggressiveness and dominance. The trial court found that, given his position of dominance, Walker must have known how Luella's funds came to be depleted between January and September 1997, despite his denial of direct knowledge of her finances. The trial court further found that,

> "[g]iven [Walker's] position of control and influence, there is [*sic*] far more than suspicious circumstances suggesting that [Walker] brought about the execution of the 97 Will. His aggressive and dominating attitude was evident at the hearing."

The court's findings implicitly discount Walker's credibility.

■       We are not in a position to second-guess a trial court's evaluation of the demeanor of witnesses. Although our review is *de novo*, the trial court's findings based on the credibility of witnesses are entitled to great weight. *Krueger v. Ropp*, 282 Or 473, 478-79, 579 P2d 847 (1978). However, the trial court's findings with regard to Walker's influence over Luella's finances and her execution of the 1997 will do not match up with the undisputed evidence that, in the last years of her life, Luella was fiercely independent with regard to her personal finances. She guarded her finances closely, keeping her checkbook and paper work in her room or by her side. There was evidence that she was suspicious of Walker,

perhaps as a result of past financial difficulties; she had removed his name from joint accounts. She guarded her documents, maintained her own checkbook, managed her own finances and kept her personal financial information private. She did not share her personal finances with any family member, including Walker. Those facts negate an inference that she was subject to influence over her financial affairs.

Considering each of the *Reddaway* factors, we find that there were no suspicious circumstances giving rise to an inference of undue influence in the execution of the 1997 will. Nor has Roberds met his burden of proving undue influence in any other manner. There is no indication that Walker had any influence on Luella with respect to her execution of the 1997 will or that he had any motive to so influence her. The only evidence is that he did not learn of the March 1996 will disinheriting him until after Luella's death. He was aware of the contents of the next most recent will, which had disposed of Luella's property equally between Sommers and Walker; the 1997 will renewed that disposition. Even if Walker had influenced Luella's decision to rewrite her will, we find that that conduct did not result in his obtaining an unfair advantage over other beneficiaries. *See Reddaway*, 214 Or at 419 (in evaluating evidence of undue influence, the question is generally whether the beneficiary, by his or her conduct, gained an unfair advantage by means that reasonable persons would regard as improper). The disposition dividing her estate equally between her two sons with whom she had a relationship was natural and equitable. We accordingly conclude that there was no undue influence in the execution of the 1997 will and that the trial court erred in so finding. Because of our disposition, we do not reach Walker's remaining assignments of error.

Reversed and remanded with instructions to probate 1997 will.