464

Argued and submitted January 6, affirmed April 22, 2015

In the Matter of H. M. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. A. M.,
*Appellant.*

Washington County Circuit Court
J120433;
Petition Number D2J120433;
A156874

348 P3d 1157

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Cecil A. Reniche-Smith, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were

Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Father appeals a judgment terminating his parental rights to his daughter, H, who was five years old at the time of trial. The juvenile court determined that father was unfit under ORS 419B.504 because, among other reasons, father's drug abuse and addiction and his drug-seeking behavior were seriously detrimental to H and that, because his conduct and conditions were not likely to change, integration into his home was improbable within a reasonable time. Father challenges the juvenile court's findings that (1) he was unfit at the time of trial, (2) H could not safely be returned to his care within a reasonable time, and (3) it was in H's best interests to terminate father's parental rights.

On appeal, father assigns error to a number of the juvenile court's determinations but devotes most of his attention to the issue of his substance abuse. He argues that DHS failed to prove that his addiction to heroin continued, because, at the time of trial, he was no longer using heroin and because his use of other drugs in the months before trial did not constitute substance abuse. He additionally contends that DHS failed to prove that his drug use was seriously detrimental to H and that the evidence did not support a conclusion that future relapse was likely. Moreover, he argues that his circumstances at the time of trial indicate that he was fit and able to safely parent H within a reasonable time.

DHS responds that father's treatment for drug addiction was unsuccessful; he denies that he has an addiction to drugs, despite considerable evidence to the contrary. Further, DHS argues that father failed to participate in counseling to address his grief over the suicide of H's mother which, according to father, precipitated his heroin abuse and could trigger future relapse. DHS also challenges father's characterization of his ability to financially provide for H.

On *de novo* review, we agree with DHS that, at the time of trial, father had not successfully treated his drug addiction, which was seriously detrimental to H. He had failed to admit the extent of his addiction or to recognize how the addiction was harmful to H and, given the severity of the addiction, H's need for stability, and father's inability

to care for H, the child could not be reintegrated into father's home within a reasonable time. Accordingly, we affirm.

## I. FACTS

We review the facts *de novo*, ORS 19.415(3)(a), but give weight to the juvenile court's demeanor-based credibility findings. *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 194, 796 P2d 1193 (1990); *see also Walker v. Roberds,* 182 Or App 121, 128, 47 P3d 911 (2002) ("We are not in a position to second-guess a trial court's evaluation of the demeanor of witnesses. Although our review is *de novo,* the trial court's findings based on the credibility of witnesses are entitled to great weight."). We begin with the circumstances that led to DHS's involvement with father and H. We next turn to father's drug addiction treatment and his progress in addressing his drug addiction. Finally, we discuss the circumstances of father and H at the time of trial.

### A. *Circumstances leading to DHS involvement*

On October 9, 2012, father and H, who had recently turned four, lived with father's parents (grandparents), having moved there soon after H's mother killed herself on H's second birthday. Over the two years since H's mother's death, father was overcome with grief and became a "basketcase." Father's brother-in-law, a mandatory reporter, informed DHS of concerns about father's drug use and H's living conditions. He had observed urine, blood, and vomit on the bed sheets and rug of the bedroom shared by father and H, along with "needles everywhere" and "little rocks of white and brown substances" that looked like illicit drugs. H had also reported to her uncle that she had seen father injecting himself in his toe. Bettis, a DHS worker, responded to the report and, accompanied by Deputy Donahue, investigated H's living conditions. Bettis observed track marks and bruising on father's arm, indicating intravenous drug use, but when he asked about them, father denied current use.

Donahue investigated father's bedroom, and observed trash, dirty laundry, empty food containers, and syringes "strewn" about the room. Donahue counted 84 used syringes. Some were on a television stand low enough to be within H's reach; he found makeup that she had been playing with on

the same stand. A number of the syringes were specially marked by father to indicate that they had been used by others known to father to have Hepatitis C. Donahue also discovered a residue amount of heroin in one of the syringes and a spoon, and 3.9 grams of heroin embedded in a cotton ball.

Donahue arrested father for heroin possession, endangering the welfare of a minor, and reckless endangerment. H's grandmother expressed doubts about grandparents' ability to safely care for H because of grandfather's health concerns and other issues. Bettis shared grandparents' concerns that they could not adequately protect H, believing that they were not "acting in a protective manner." Bettis placed H in protective custody and then drove her to the hospital for a urinalysis (UA) to determine if she had been exposed to illicit drugs. The test was negative, and Bettis described H at the time of removal as a "healthy average child."

At trial, father characterized the state of the room when H was removed as "extremely unusual." He explained that the needles were only out because he was counting them for a needle exchange. According to father, no drugs were found. When asked whether H was unsafe in the home, he replied that she was "never in any harm." He also stated that he cleaned the room "all the time." Father's assertions were contradicted by grandmother's description of the room in the months leading up to DHS's intervention. Grandmother, on more than one occasion, observed and took pictures of syringes and drug paraphernalia in the room. She stated that needles were sitting out "probably daily." Grandmother confronted father about the danger of leaving needles lying about in the room, but he would tell her that H "wouldn't get hurt because she was told to leave them alone." She described the room's condition as deplorable, and noted that she feared for H's safety.

Before DHS's intervention, grandmother assumed responsibility for almost all of H's care. She fixed meals for H, took her shopping and paid for her clothes, and took her to the doctor. Father did not contribute rent or money for utilities or household expenses, even though grandparents

were facing financial difficulties. Father was not employed, but received Social Security benefits and also had money that he had received from an accident insurance settlement. Before the death of H's mother, father had never lived by himself, and the longest he had lived away from grandparents' home was for the three years when he lived with H's mother. Unemployed at the time of DHS's removal of H, father's employment history was limited to owning a store that sold paraphernalia for marijuana, growing marijuana for medical marijuana card holders, working for six months at a car wash, and some sporadic construction remodeling work.

## B.  *Father's drug addiction treatment*

At the time of H's removal, father was using heroin and Oxycodone several times a day. His use of opiates began with Oxycodone, which had been prescribed for a back injury; the Oxycodone use shifted to heroin use when, according to father, his prescription for Oxycodone ran out. DHS referred father for a full assessment with Comprehensive Options for Drug Abuse (CODA). CODA recommended a Suboxone treatment program, which is opiate replacement, and residential treatment for father's opiate addiction. Father rejected CODA's treatment recommendations after they refused to provide him with methadone, and decided instead to proceed with Allied Health Services, which provided outpatient methadone treatment.

The results of father's first several months of treatment were poor. From the beginning of his treatment in November 2012 through July 2013, father had numerous positive UAs for cocaine, marijuana, benzodiazepines, and opiates other than methadone. An expert on drug addiction, Dr. Larsen, who founded and served as medical director of CODA, explained at trial that opiate painkillers such as Oxycodone and heroin are all of the same opiate class. In addition to father's opiate addiction, he was a long-term user of benzodiazepine pills, which are prescribed to treat anxiety. In May 2013, father was jailed for a parole violation because of his positive UAs. Father's positive UAs for benzodiazepines and opiates and his failure to participate in group sessions at Allied led his drug addiction counselor to

recommend an in-patient treatment program. But in August 2013, father, after two clean UAs, expressed to his counselor that he did not need residential treatment.

Around that time, Smith, a DHS caseworker, worked out an action agreement with father; the expected outcomes were that father had to "admit that he has a substance abuse problem, work on the issues that are its cause, and demonstrate an ability to remain clean and sober for an extended period of time." Father also had to "admit that he exposed [H to] dangerous living conditions including drug paraphernalia, explore the reasons for this neglect, and demonstrate that he has learned appropriate parenting skills." Smith testified that "it's commonly known in the treatment community that if you're in denial of your substance problem, treatments [are] not going to be effective." In January 2014, father entered into another action agreement with the same expected outcomes.

In September 2013, DHS petitioned to terminate father's parental rights. On December 6, 2013, father tested positive for benzodiazepines. Father denied to Meigs, his Allied treatment counselor, that he had taken benzodiazepines without a prescription, and Miegs believed him and, consequently, did not take any action. Father testified at trial that the positive test result was the result of his taking a pill left from a 2012 prescription. In Meigs's view, retaining old benzodiazepines while in treatment for over a year is "absolutely" concerning; using benzodiazepine without a current prescription is substance abuse and a "direct violation" of father's agreed treatment plan. A month before the positive test result, father, when confronted with his previous positive UAs, had told Meigs that he was "never going to use benzos again." Meigs and Larsen testified that benzodiazepine used in conjunction with opiates, including methadone, is highly dangerous and can lead to respiratory failure or even death.

Father tested positive for morphine and codeine in November 2013, and tested positive for hydrocodone in January 2014. From November 2013 to the time of trial, father had a number of medical issues, including a work injury, a toe condition, and extensive dental work, for which

he was prescribed opiate pain medication that explained the positive test results. Between October 2013 and March 2014 (after his termination trial had begun), however, father was given 10 opiate prescriptions from 6 different doctors. Father did not disclose to the prescribing doctors that he was being treated with methadone for an opiate addiction, nor did he disclose his other opiate prescriptions. His reasons for not alerting the doctors were that he would be "treated differently" and "it's none of anybody's business." Father's behavior was extremely dangerous because he was taking 140 milligrams of methadone (the usual dose is 10 milligrams) and, according to Larsen, taking opiate pills greatly increases the risk of "overdose or death." Larsen also believed that father's pattern of obtaining opiate prescriptions was typical of "doctor shopping," a practice of going to several different doctors to obtain prescription drugs to satisfy an addiction or to sell on the street.

According to father, he never asked a dentist or doctor for opiate pain medication during his recent use. Father believes that he does not have an addiction to heroin because he no longer uses it, nor does he have an addiction to prescription pain medication because now he seeks opiate pain medication only when he has to. His belief was contradicted by Meigs, who explained that, in the field of drug addiction treatment, nonuse is not viewed as indicative of being free from addiction; rather, addiction is a long-term problem, and those concepts were discussed often as part of the Allied treatment program. Larsen also noted that a person on methadone is still addicted to opiates and that to believe otherwise is possibly "delusional." He also stated that there is a high risk of relapse for opiate addicts if they have gone through methadone treatment. In Larsen's view, father's treatment record indicates that he is not close to successfully treating his addiction.

At the time of trial, father was not attending an outside support group to address his addiction even though Allied referred him to participate in AA or NA meetings. Father's plan for preventing relapse was to "stay busy" by watching movies at home, reading, working, and avoiding "people that would bring [him] down." Meigs stated that regular participation in outside support groups was

essential, and Larsen explained that such support groups greatly enhance the chances of recovery. Moreover, at the time of trial, father had not obtained counseling for his grief over H's mother's suicide, despite recommendations from his Allied counselors that he do so and his own belief that grief is a potential trigger for relapse. During his treatment, he explained to his Allied counselor that one of the primary reasons for his substance abuse was the absence of someone with whom he could talk. He asked DHS for financial assistance with counseling, but refused to participate in a psychological evaluation, which was a prerequisite to obtaining DHS support for counseling services.

## C. *Father's parenting classes and contact with H*

Father regularly attended supervised visits with H. The visits were positive and H showed affection for father, although she was more demonstrative in her affection for her foster parents (her aunt and uncle), who would accompany her to the visits. Father and H also talked on the phone. At first, the phone calls were short, but after receiving advice from her uncle to ask H about her life rather than talk about father's own life, the phone calls became longer. Father also participated successfully in seven sessions of a parenting class.

## D. *Father's circumstances at the time of trial*

At the time of trial, father was living with his parents in a small two-bedroom apartment, paying them $40 a week in rent. Grandmother believes that he is incapable of parenting H, testifying that, "[e]ven though he has a car and a job, he can't take care of somebody else too until you get on your feet yourself. And, granted, the car and the job are baby steps going forward and I know he is improving. It still isn't enough, I think, to throw a five year old into the mix." Although father thinks his mother could provide childcare for H, grandmother's resources are tied up with care of grandfather, who has significant medical issues. Grandmother believes that the bond between father and H is tenuous and that father often does not show much interest in H's life.

Grandmother stated that it was not possible for father and H to move back in with her and grandfather because there was not enough room in their two-bedroom

apartment. She predicted that, if H lived in their home, she would see grandmother as the primary parent, and commented that, if father wants to be a parent, he must rely on himself and obtain his own housing. Moreover, because of grandparents' inability to protect H from the unsafe conditions of the home previously and their failure to report those conditions to DHS, father and H would not be permitted to live with them in any event.

E.   *H's circumstances at the time of trial*

Sage, a psychologist, evaluated H. Sage asked H where she preferred to live, and H responded that she preferred to continue to live with her aunt; her wish was to "live with auntie and uncle for [her] whole life." H opined that, if she lives with father, "[h]e'll take bad care of me." H expressed that she enjoyed visiting with father, but also looked forward to being picked up by her aunt at the end of the visits. Sage observed that H was sweet, cooperative, and passionate, but also that she was very anxious, as evidenced by pressured speech, psychomotor agitation in the form of standing up frequently, shaking and trembling, and constantly inquiring of caregivers about what would happen during the day or with Sage about how the interview would proceed. She also observed that H's spontaneous demonstration of affection toward her aunt and uncle at the end of the evaluation was unusual for children and that it appeared she needed the affection to calm herself. In Sage's opinion, H's aunt and uncle are her primary attachment figures and she looks to them for guidance and security. Sage also provisionally diagnosed H with a generalized anxiety disorder, which is characterized by excessive symptoms of anxiety—worry that is difficult to control—which affects daily functioning. H was one of the most anxious children that Sage has evaluated. Sage stated that H has a great need for permanent and stable caregivers as soon as possible, and that H's age is a particularly important time for forming primary attachment relationships, as she has done with her aunt and uncle. If H were to be returned to father, she would be at risk for an attachment disorder and other psychological difficulties. Sage also noted that H's social, emotional, and attachment development is at risk if she is returned to an environment where there is abuse of controlled substances.

## II. ANALYSIS

The juvenile court terminated father's parental rights on grounds of unfitness under ORS 419B.504. That statute permits termination if the court finds by clear and convincing evidence that the parent is "unfit by reason of conduct or conditions seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change." "Evidence is clear and convincing if it makes the existence of a fact 'highly probable' or if it is of 'extraordinary persuasiveness.'" *State ex rel Dept. of Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007) (quoting *State ex rel Dept. of Human Services v. Hinds*, 191 Or App 78, 84, 81 P3d 99 (2003)). A parent's unfitness is assessed as of the time of the parental rights termination trial, *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006), and depends "on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *State ex rel SOSCF v. Stillman*, 333 Or 135, 146, 36 P3d 490 (2001). ORS 419B.500 also requires that termination of parental rights must be in the child's best interests.

Courts determine parental unfitness in two steps. First, the court determines whether "(1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child." *Stillman*, 333 Or at 145. The second step requires a determination of whether "integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change." *Id.* (quoting ORS 419B.504). A "reasonable time" is measured according to the needs of the child, that is, the period of time "is reasonable given a child['s] emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20).

The crux of father's argument on appeal is that he successfully treated his opiate addiction. He argues that, at the time of the termination trial, he was no longer using

heroin and that an isolated use of benzodiazepine a few months before trial and his use of prescribed opiates were not examples of substance abuse. He also posits that his "lackluster" participation in group counseling and his failure to obtain counseling for his grief related to H's mother's suicide are insufficient evidence of a substance abuse problem. According to father, replacement of heroin with prescribed methadone satisfactorily addresses his problems with heroin and illicit opiate use.

Because he believes that he successfully treated his heroin addiction, father argues that the evidence was insufficient to show a condition seriously detrimental to H. That is so because, in his view, he "significantly adjusted" his circumstances in treatment. He describes himself as "high functioning" because he has obtained full-time employment and reliable transportation and says that he is prepared to move out of his parents' home and obtain his own residence should he regain custody of H. Moreover, he points out that his efforts to maintain a relationship with H have been consistent and that H wants to maintain a relationship with him. He also notes that he completed a parent-training program. He further contends that, because the evidence was insufficient to show that his substance abuse was seriously detrimental to H, it follows that the evidence was insufficient to show that it was improbable that he could adequately care for H within a reasonable time. Finally, father argues that termination of his parental rights is not in H's best interests. He posits that a permanent guardianship is the better disposition because severing H's legal relationship with him and allowing H's aunt and uncle to adopt her would constitute "reengineering her family tree."

We first discuss father's use of nonprescription benzodiazepine and prescription opiates in the months preceding trial. Father's characterization of his use of benzodiazepine is not consistent with the more persuasive evidence that his behavior constitutes substance abuse and is highly concerning because of father's history. Father also engaged in doctor shopping for prescription opiates. Father's failure to disclose his methadone use to his prescribing doctors undercuts his insistence that the opiate prescriptions were

solely to address his medical conditions.[1] His reasons for the nondisclosures—that he would be "treated differently" and "it's none of anybody's business"—are inadequate given the consequences of overdosing and testing positive for drugs—violating his probation or endangering his treatment plan, both of which could be seriously detrimental to his ability to care for H.

Moreover, father does not comprehend or acknowledge the seriousness of his addiction and the circumstances that led to H's removal from his care. Father's minimization of the dangers of H's living conditions before removal is concerning given the credible evidence that police found heroin in their room and that family members regularly saw needles within H's reach before DHS came to the home. Additionally, father's belief that he does not have an addiction to opiates is inconsistent with his counselor's and Larsen's testimony and is problematic because it increases the risk of relapse.

Despite his recognition that H's mother's suicide contributed to his opiate addiction and is a potential trigger, and despite the fact that his Allied counselor suggested counseling to address his grief more than a year before the termination trial, father still has not obtained counseling. Moreover, his participation in group counseling and other outside support has been poor. Father has no history to support his contention that he could handle his addiction on his own and, accordingly, his contention that he can do so now is not credible. In sum, father's behavior does not indicate that he is successfully treating his opiate addiction or substance abuse problem.

Father cites *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 308 P3d 307 (2013), and *Dept. of Human Services v. C. Z.*, 236 Or App 436, 236 P3d 791 (2010), for the proposition that his use of prescription medication was insufficient to establish serious detriment to H. Those cases, however,

---

[1] Those findings are consonant with the juvenile court's demeanor-based credibility findings. The court noted, among other views on father's credibility, that it "could not rely on [father's] testimony as a fact finder and because there was an inability to tell when [father] understood what was going on, inability to tell when [father] was in denial about [his] own circumstances and inability to tell when [he was] not just telling the truth[.]"

are readily distinguishable. In *C. J. T.*, we concluded that there insufficient evidence to support current marijuana use by the mother and that there was an insufficient nexus between the mother's past use of marijuana and a risk of harm to her children. 258 Or App at 63. Similarly, in *C. Z.*, we concluded that the record failed to show that the mother "had used drugs in the presence of children, or in the home, or that her drug use created a harmful environment for the children" or "endangered or would likely endanger the children." 236 Or App at 443. Here, we find that father is unfit because he has not successfully treated his substance abuse problem, a problem that created circumstances dangerous to H.

Although we recognize that father has made some strides since DHS took custody of H, we conclude that his progress has been inadequate to treat his substance abuse problem and that his failure to successfully treat his drug addiction is conduct that is seriously detrimental to H. Moreover, for many of the same reasons, we also conclude it is improbable that H can return to father's care within a reasonable time. His reluctance to address the underlying causes for his addiction and to establish support for achieving sobriety, and his refusal to even admit that he has an addiction, make it unlikely that his conduct or condition will improve within a time suitable for H, given her immediate need for permanency.

Finally, we conclude that it is in H's best interests that we terminate father's parental rights. Although H has a bond with father, he has never been her primary caregiver, a role first performed by her mother, then by grandmother, and, at the time of trial, by her aunt and uncle. Changing her circumstances would jeopardize the attachment she has formed with her aunt and uncle and, given evidence of her anxiety disorder, would only add to those serious problems.

Affirmed.